[Nos. B069188, B069205, B069220, B069282. Second Dist., Div. Four. Mar. 22, 1993.]

COMMERCIAL NATIONAL BANK IN SHREVEPORT et al.,
Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
JOHN GARAMENDI, as Insurance Commissioner, etc., et al., Real Parties
in Interest.

**COUNSEL**

Pillsbury, Madison & Sutro, Philip S. Warden, Robert L. Wallan, Lillick & Charles, Stephen Oroza, John M. Rosenthal, Kristine E. Bailey, Pachulski, Stang, Ziehl & Young, Larry W. Gabriel, Fried, Frank, Harris, Shriver & Jacobson, Jed S. Rakoff, Howard W. Goldstein, Stephen D. Alexander, Manatt, Phelps, Phillips & Kantor, Philip Recht, Weinberg & Green, Charles O. Monk II, Arthur F. Fergenson, Thelen Marrin Johnson & Bridges, Christine Franklin, Gary L. Fontana, Adams Duque & Hazeltine and Catherine Ruddy for Petitioners.

Squire, Sanders & Dempsey, R. Thomas Stanton, Joseph R. Cortese, Frances Floriano Goins and James W. Satola as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Daniel E. Lungren, Attorney General, Edmund B. Mamer and Mark Richelson, Deputy Attorneys General, Rubinstein & Perry, Dana Carli Brooks, Matthew G. Ainley, Karl L. Rubinstein, McNitt, Edwards & Schraner, Kenneth A. Zak, Brobeck, Phleger & Harrison, Robert L. Hagle, Kent M. Roger, G. Larry Engel, David M. Higgins, Mahoney, Coppenrath, Williams & Jaffe, Walter Coppenrath, Jr., Marie E. Collins, Irell & Manella, Kenneth Robert Heitz, Kevin A. Frankel, Parker, Milliken, Clark, O'Hara & Samuelian, Michael S. Simon, Hopkins & Sutter, Carlisle Herbert, Van Bourg, Weinberg, Roger & Rosenfeld, Michael B. Roger, Dan Siegel and Peter N. Hagberg for Real Parties in Interest.

Buchalter, Nemer, Fields & Younger, Jonathan F. Bank and Iain A. W. Nasatir as Amici Curiae on behalf of Real Parties in Interest.

## OPINION

EPSTEIN, J.—This is the second case to reach us as a result of the insolvency of Executive Life Insurance Company (ELIC). In the first, *Texas Commerce Bank* v. *Garamendi* (1992) 11 Cal.App.4th 460 [14 Cal.Rptr.2d 854], we held that municipal bond guarantee contracts (Muni-GIC's) issued by ELIC in 1986 were annuities and hence "life insurance" within the meaning of Insurance Code section 101.[1] Since these contracts qualify as annuities, we held that their owners are policyholders, entitled to class-5 priority status under section 1033.

We now consider the more basic question of the validity of the rehabilitation plan for the business of ELIC, as formulated by the Commissioner of Insurance (Commissioner) and approved by the respondent court.

The plan was developed in the course of insolvency proceedings instituted by the Commissioner on April 11, 1991. By that date ELIC had billions of dollars of insurance in force, but its financial condition had become so precarious as to require the Commissioner's intervention in the public interest. ELIC's insolvency was not due to problems with its considerable book of business, but to the condition of its investment portfolio.

The seizure of its assets and institution of a conservatorship were actions taken by the Commissioner in accordance with law (§ 1010 et seq.)

---

[1] All statutory references are to the Insurance Code unless otherwise indicated.

in order to safeguard the assets and, if possible, to preserve the business of the company. When "an insurance company gets into financial difficulties, something must be done to remedy the situation. Either the company must be liquidated, and its assets distributed to its creditors, thus immeasurably injuring many of its policyholders who are thus deprived of insurance protection, or the business must, if possible, be rehabilitated. The public has a grave and important interest in preserving the business if that is possible. Liquidation is the last resort." (*Carpenter* v. *Pacific Mut. Life Ins. Co.* (1937) 10 Cal.2d 307, 329 [74 P.2d 761].)

In accordance with this public policy, the Commissioner has undertaken to rehabilitate the business of ELIC. The statutory authority he exercises in that effort is an aspect of the police power of the state. It is substantial in its scope, but not boundless. Its basic parameters were described by our Supreme Court over 55 years ago in *Carpenter* v. *Pacific Mut. Life Ins. Co.*, *supra*, 10 Cal.2d at page 329: "The only restriction on the exercise of this power is that the state's action shall be reasonably related to the public interest and shall not be arbitrary or improperly discriminatory."

This standard and the requirements of the statutory provisions governing insurance insolvency proceedings furnish the test against which a court must judge any plan of rehabilitation. If they are satisfied, the court should defer to the executive judgment of the Commissioner and approve the plan. If they are not, the plan (or, at least, the offending provisions of the plan) must be referred back to the Commissioner for such modification as is required to formulate a plan that will satisfy the legal requirements.

We have thoroughly reviewed the challenged aspects of the plan submitted in this case. For reasons we shall discuss in detail, we are obliged to conclude that these provisions of the plan do not satisfy the *Carpenter* standard, or the statutory requirement (in §§ 1025 and 1033) that claims in a class share ratably with other claims in the same class. The plan is legally deficient in three respects: it sets up a unique "two-tier" valuing system for Muni-GIC's that is without any basis in law; it establishes a "dual valuation" system that improperly discriminates between substantially identical policies in the same class; and it selects a liquidation valuation date for those who choose not to accept restructured policies that has no relationship to the amount of assets that would be available for distribution were liquidation to occur.

Because of these deficiencies, we must direct that the order approving the rehabilitation plan be set aside. We do so with the hope and expectation that the deficiencies will be corrected and a new plan submitted that can be approved.

## FACTUAL AND PROCEDURAL SUMMARY

We begin with a review of the ELIC insolvency proceedings and the nature of the various ELIC insurance contracts involved in that litigation.

Immediately upon his appointment by the court as conservator of the ELIC estate on April 11, 1991, the Commissioner proceeded to sequester and conserve the assets of the insolvent company.[2] The size of the insolvency estate increased as payments to its general creditors ceased (except as necessary to preserve certain assets) and a moratorium was placed on payment of almost all benefits to ELIC policyholders.

The Commissioner embarked upon an effort to sell the noncash assets of ELIC, and to create a plan of rehabilitation whereby the insurance business of the company could be perpetuated for the benefit of policyholders.

Early in the insolvency proceedings, a dispute arose over the priority claim status of the eight Muni-GIC's which had been purchased for a total sum of $1.8 billion. In *Texas Commerce Bank* v. *Garamendi, supra,* 11 Cal.App.4th 460, we held these instruments to be annuities and their holders to be entitled to class-5-priority status. The nature and structure of the Muni-GIC's were described in the *Texas Commerce Bank* case (*id.* at p. 466), and we provide only a brief summary here.

The Muni-GIC's were issued to banks that acted as indenture trustees for eight municipal entities. Through these annuities, ELIC promised to make guaranteed, periodic accumulated interest payments to the trustee banks. The indenture agreements with the municipal entities required the banks to purchase Muni-GIC's from ELIC with the proceeds of funds raised by the entities through the sale of municipal bonds. The banks were required to transmit a part of the periodic annuity payments and special withdrawals from the Muni-GIC's to the municipal entities, and, on their behalf, to pay all debts on a pro rata basis.

The result was that ELIC was the issuer and the trustee banks the policyholders of the Muni-GIC's. The municipal entities were the sole intended third party beneficiaries of these instruments, and the municipal bond purchasers were creditors of the municipal entities.

During the pendency of the Muni-GIC claim priority dispute, the Commissioner entertained bids for assumption of portions of ELIC's assets and

---

[2]We refer to the April 11, 1991, date as the "insolvency date" (because the insolvency of ELIC was declared on that date) and as the "date of the conservancy order" or "conservancy date" (because the Commissioner was appointed conservator of the ELIC estate on that date).

liabilities through a rehabilitation plan. This included sale of substantial portions of ELIC's "junk bond" portfolio, and a negotiated rehabilitation plan. The successful bidder was New California Life Holdings, Inc. (Newco), a California insurance company.

The rehabilitation plan provides for transfer of essentially all liabilities and assets of insolvent ELIC to Aurora National Life Insurance Company (Aurora), a subsidiary that Newco acquired and recapitalized to effect the plan. The present value of ELIC assets to be transferred is estimated at $7.2 billion or more, but no adjudication of the precise value has been made. In addition to the transferred assets of ELIC, Aurora will have access to an additional $300 million capital infusion now held in trust by another Newco subsidiary, Altus.

The plan also incorporates benefits under an enhancement agreement negotiated through the National Organization of Life and Health Insurance Guaranty Associations. Under that agreement, the guarantee associations of 43 states will supplement the rehabilitation plan with substantial assets for the benefit of insurance contracts which these associations are otherwise obligated to cover under the laws of their respective states. The plan deems this contribution as fulfilling the statutory obligations of the associations to their respective covered policyholders.

Aurora will assume liability for all ELIC insurance contracts and will issue restructured insurance contracts to owners of ELIC contracts who agree to participate in the plan. Aurora will make lump-sum "liquidation" cash payments to contract holders who elect not to accept a restructured contract. The plan provides all policyholders the right to opt out, but it is designed to discourage that election.

The benefits due under the restructured insurance contracts and the liquidation payments to be made to policyholders who elect to opt out are determined by a series of complex formulae. (We provide a summary description and analysis of these methods, as required, in our discussion of the issues.)

The initial step in valuing ELIC policies is to calculate the "account value." The plan uses a dual valuation method (which we discuss, *post*) by which all policies are classified as "declared rate" or "implied rate" contracts. The account values of all contracts are then totaled and divided into the value of ELIC's distributable assets as of the effective date of the plan. The result is the cents-on-the-dollar "restructuring percentage." The "ELIC restructured value" of each contract for purposes of determining benefits is derived by multiplying its account value by the restructuring percentage.

The value of each restructured contract for purposes of fixing its alternative liquidation cash-out payment is obtained by multiplying the account value by the "liquidation percentage." That percentage, in turn, is fixed by dividing the value of ELIC's distributable assets as of the April 11, 1991, insolvency date by the total account values of all contracts. The trial court has adjudicated the value of the distributable assets on April 11, 1991, to be $5.044 billion. Based on that, the liquidation value of a restructured contract will be about 72 percent of its value for purposes of benefits as a continuing Aurora restructured contract.

The plan assumes the Muni-GIC holders to be entitled to class 5 priority, contingent upon affirmance of the trial court's decision that they are entitled to that status. As we have discussed, we affirmed that determination in *Texas Commerce Bank*, a decision that has now become final.

While there was extensive expert opinion testimony about the valuation methods used in the plan, and about alternative methods, there were few significant disputes as to the material facts. The principal dispute is over a legal issue: whether the valuation methods used are arbitrary and improperly discriminatory.

The court issued its order approving the plan on July 31, 1992. This was immediately followed by petitions for extraordinary writ and notices of appeal. We have chosen to review the order by extraordinary writ because of the importance of a prompt appellate determination to numerous policyholders and to the California insurance industry.[3] We therefore do not determine whether the challenged ruling is immediately appealable as a final judgment.

DISCUSSION

I

*The Statutory Scheme and Court Decisions*

The California insurance insolvency law is codified in article 14, chapter 1, division 2, part 2 of the Insurance Code. It was enacted in 1935, based on the New York insurance law. (*Carpenter* v. *Pacific Mut. Life Ins. Co., supra,* 10 Cal.2d at p. 328.) Article 14 includes more than 60 sections, but only a few are pertinent to our discussion.

---

[3]We refer to "petitioners" generally as including the eight banks that purchased the Muni-GIC's, the underwriters of those contracts, the holders of pension guaranteed investment contracts (Pension GIC's) and others who have petitioned for review based on the treatment of either type of GIC in the plan.

Section 1011 authorizes the Commissioner to initiate conservatorship proceedings by filing a verified application in the superior court. Nine grounds are specified, including the circumstance applicable in this case: that the insurer "is found, after an examination, to be in such condition that its further transaction of business will be hazardous to its policyholders, or creditors, or to the public." (§ 1011, subd. (d).) Upon appointment as conservator, the Commissioner is vested with title to all assets of the insurer, is commanded to take possession of its property, and is authorized to conduct so much of its business as he or she deems appropriate.

In the insolvency proceedings thus commenced, the Commissioner is deemed to be a trustee for the benefit of all creditors and others interested in the estate of the insolvent insurer. (§ 1057.)

Section 1023 provides for the form and content of claims in insolvency proceedings.

Section 1033 establishes a schedule of priority for claims against the estate of the insurer, placing policyholder claims in the fifth position (superior only to "all other claims").

The classification of claims into specific priority levels establishes the rights of the claimants to share ratably with other claimants in the same class. (See *Jones & Son* v. *Independence Ind. Co.* (1942) 52 Cal.App.2d 374, 379 [126 P.2d 463].) This policy also is reflected in section 1025, which controls the filing and resolution of unliquidated and undetermined claims. Once such claims have been "definitely determined, proved and allowed," they "share ratably with other claims of the same class in all subsequent determinations."

Section 1016 authorizes the superior court to issue an order of liquidation upon proper application of the Commissioner, and section 1019 provides that when a liquidation order is issued, the rights of policyholders and all others interested in the assets of the insolvent insurer "shall, unless otherwise directed by the court, be fixed as of the date of the entry of the order" by the county clerk.

Section 1037 confers broad powers on the Commissioner as conservator or liquidator to handle the insurer's affairs during the insolvency proceedings.

Finally, section 1043 authorizes the Commissioner, with court approval, to mutualize or reinsure the business of the insurer "or enter into rehabilitation agreements." The section does not elaborate on the Commissioner's

powers with respect to rehabilitation agreements, but we read it in pari materia with the other provisions of article 14. The entire statute imposes a fiduciary duty on the Commissioner, as a trustee, to all policyholders to ensure that each is treated fairly and shares ratably with other policyholders.

Since its enactment in 1935, the insolvency article has been construed and applied in a number of cases. Three of them—*Carpenter* v. *Pacific Mut. Life Ins. Co.*, *supra*, 10 Cal.2d 307, *Neblett* v. *Carpenter* (1938) 305 U.S. 297 [83 L.Ed. 182, 59 S.Ct. 170], and *Caminetti* v. *Pacific Mut. Life Ins. Co.* (1943) 23 Cal.2d 94 [142 P.2d 741]—are central to the issues before us in these proceedings. Each of this trilogy arose out of the 1936 insolvency of Pacific Mutual Life Insurance Company.[4] Of these, *Carpenter* is by far the most significant for our purposes.

The insolvency of Pacific Mutual was brought about by noncancelable accident and health policies for which insufficient premiums were charged. The losses caused by these policies threatened to overwhelm the profitable book of business the company conducted in the life insurance field and would, if unchecked, eventually have led to liquidation of the entire company. The Commissioner instituted conservancy proceedings and eventually succeeded in formulating a plan of rehabilitation that made it possible to avoid cancellation of the company's insurance. To do that, policies were restructured in such a way that the benefits provided to insureds by the accident and health plans were reduced, while the life insurance policies were not substantially changed. Persons holding accident and health policies were given the option of accepting the restructured and reduced policies, or opting-out of the plan and accepting a lump-sum payment based on what they would have received if the company simply had been liquidated. (*Carpenter* v. *Pacific Mut. Life Ins Co.*, *supra*, 10 Cal.2d at pp. 321-322.)

The plan was approved. The court held that section 1043 allowed the Commissioner to rehabilitate as well as to liquidate, and that this power extended to reorganizations in which a new insurance company takes over the business of the insolvent through restructured policies. (10 Cal.2d at pp. 329, 332.)

The court addressed claims that imposing a new contract and a new insurance company effected an unlawful impairment of contract rights. The court also considered the argument that the Commissioner's authority did

---

[4]There are many other reported decisions arising out of the insolvency of Pacific Mutual. (See cases collected in *Pacific Mut. Life Ins. Co.* v. *McConnell* (1955) 44 Cal.2d 715, 736 [285 P.2d 636] (dis. opn. of Carter, J.).) The appellate plume flowing from the insolvency extended over two decades.

not permit any discrimination between the life policyholders and the holders of noncancelable accident and health insurance. The court found these arguments to be without merit:

"It is no longer open to question that the business of insurance is affected with a public interest. The state has an important and vital interest in the liquidation or reorganization of such a business. [Citations.] Neither the company nor a policyholder has the inviolate rights that characterize private contracts. The contract of the policyholder is subject to the reasonable exercise of the state's police power." (*Carpenter* v. *Pacific Mut. Life Ins. Co.*, *supra*, 10 Cal.2d at p. 329.)

It was in this context that the court made its statement, quoted near the beginning of this opinion, that the only restriction on the exercise of the police power in insurance rehabilitation is that it be reasonably related to the public interest and "not be arbitrary or improperly discriminatory." (10 Cal.2d at p. 329.)

To the claim that the plan was unlawfully discriminatory because life policyholders were taken into the plan on more liberal terms than holders of noncancelable accident and health policies, the court pointed out that policyholders who consent to the new plan enter into a novation and, having done so, cannot complain of unfair treatment. Dissenters had no legal cause to complain "simply because the commissioner determined to rehabilitate rather than liquidate. . . . All that the law requires as to a dissenter is that he receive the liquidated value of his contract rights without unreasonable delay—he has no vested right to immediate payment. . . . [¶] . . . [¶] All the dissenter is entitled to is the equivalent of what he would receive on liquidation." (*Carpenter* v. *Pacific Mut. Life. Ins. Co.*, *supra*, 10 Cal.2d at p. 335.)

*Carpenter* provided an alternative justification for the disparate treatment by which holders of one type of policy were given relatively more favorable benefits than another. That discrimination is justified if it is founded on a rational basis related to effecting a successful rehabilitation. Pacific Mutual's life insurance policies were a profitable book of business, but the noncancelable accident and health policies had brought about the insolvency of the company because they had been issued at insufficient premium rates and could not be cancelled. The court explained that the only feasible means of saving the insurance business of the company was to give the life policies competitive benefit levels so that they would continue to generate profit and eventually permit elevation of benefit levels for the initially disfavored noncancelable policies. Thus, the disparate treatment of the restructured

noncancelable policies was rationally based and recognized as necessary to avoid straight liquidation of the insolvent's business. (10 Cal.2d at pp. 336-337.)

In the case of the ELIC rehabilitation plan, there was no suggestion that any line of the company's insurance business was unprofitable, much less so unsound as to jeopardize the fiscal health of the company. The insolvency was brought about by other circumstances, having to do with the investment of premium income.

We view *Carpenter* as critically important in analyzing the ELIC rehabilitation plan. We realize, however, that it does not squarely resolve all of the issues presented by that plan. For example, it does not determine whether a rehabilitation plan that allows all policyholders to opt out and receive at least the equivalent of a true liquidation share must value all types of opting-out policies equally. *Carpenter* approved a plan that treated all types of policies equally as opt-outs, and the court was not called upon to decide the validity of a plan in which a minimum liquidation share is guaranteed but in which different types of policies receive different payment levels above that minimum.

*Carpenter* also does not decide the appropriate date for valuation of an insolvent insurer's distributable assets for purposes of calculating opt-out liquidation values.[5]

The *Carpenter* decision was affirmed by the United States Supreme Court in *Neblett* v. *Carpenter, supra,* 305 U.S. 297. The *Neblett* court addressed the claim that an impairment of contract arises "from the less favorable terms and conditions of the new noncancelable policies which are to be substituted for the old ones and, in the case of the life policies, by the substitution of a new company as contractor in place of the old, without the consent of the policy holder." The argument was based on the theory that policyholders were compelled to accept the new company as insurer on terms set out in the rehabilitation plan. The court found the premise of the argument to be unsupported because policyholders were not compelled to accept the new company or restructured policies; instead, they were given the option of liquidating their interests on terms that appeared to be as favorable as those

---

[5]Real parties argue that *Carpenter* recognizes the insolvency date as the date for valuation. But in *Carpenter* the conservancy order (under § 1011) and the rehabilitation order (under § 1046) were on the same date (10 Cal.2d at pp. 316, 317), and both were determined on appeal to have been voided by the subsequent disqualification of the judge who entered them. Months later, orders for conservation and insolvency were entered by the successor judge. (*Id.* at p. 319.) *Carpenter* does not discuss the date on which the assets of the estate should be valued.

they would have received from a complete liquidation of the assets of the company. (305 U.S. at p. 305 [83 L.Ed. at p. 189].)

In *Caminetti* v. *Pacific Mut. Life Ins. Co., supra,* 23 Cal.2d 94, the last case in the series, our Supreme Court addressed the proper method for determining the value of the claims of those holders of noncancelable disability policies who dissented from the rehabilitation plan and chose to take a lump-sum cash payment. *Caminetti* approved a plan that was based on the policyholder's share of the "reserve." The court described a five-step method for calculating the policyholder's share: (1) calculation of the total projected benefits of all policies for the life expectancy of the insured (since the policies were noncancelable); (2) calculation of the total premiums that would be received during the policy terms; (3) commutation of each amount to its present value, using a 7 percent simple interest rate (the legal rate at that time); (4) subtraction of the commuted premium total from the commuted total of benefits; and (5) distribution of the difference to dissenting policyholders on a pro rata basis. (23 Cal.2d at p. 108.) The court was careful to limit its holding to the particular type of policies involved. (*Id.* at p. 110.)

With this background of the statutory scheme and the principal cases that have construed it in place, we proceed to review specific challenges to the ELIC rehabilitation plan.

## II

### *The Two-tier System*

The central issue in this litigation is how policyholder accounts are to be valued for purposes of calculating the terms of restructured policies and the amount of lump-sum payments to be made to those who choose not to accept those policies.

 In the case of Muni-GIC's, and for them alone, the plan sets up a valuation system that disregards the actual policyholders and the amounts they paid to purchase their annuities. This is the "two-tier" system, and it is the basis of the first challenge to the plan that we discuss.

The assumption of the two-tier system is that the trustee banks that purchased and that hold the Muni-GIC's, and to which they were issued, are not policyholders. Instead, the system looks through the banks and the municipalities that furnished the funds to buy the policies, to the current owners of the municipal bonds issued to raise funds used to purchase the

annuities.[6] The valuation is not based on the amount raised from the sale of municipal bonds for purchase of the annuities or on what ELIC received for the annuities, but on what each bondholder of record actually paid for bonds on the primary or secondary market, if the acquisition was on or before the April 11, 1991, insolvency date. For purchases after that, the plan uses the market value of the bonds on April 11, 1991.

Stated in another way, the system disregards the $1.8 billion actually paid to ELIC for the Muni-GIC annuities, and looks instead to the out-of-pocket amounts paid by persons who were bondholders of record on April 11, 1991, and to the market price on that date for bondholders who purchased bonds thereafter.

The effect of disregarding the premiums actually realized by ELIC is significant. It is undisputed that a large number of the municipal bond owners purchased their positions on the secondary market at prices below, and in some cases substantially below, the par-value issuance price. Devaluing the Muni-GIC's reduces the amount to be paid or credited to their owners, either in benefits or in opt-out payments. The money realized by this devaluation increases the value of other policies relative to the Muni-GIC's.

The Commissioner argues that rehabilitation proceedings are equitable in nature and that the plan is fair because it prevents profit taking by those who purchased bonds for less than a par consideration. He also asserts that statutory requirements for recognition of consideration and ratable distribution are satisfied by focusing on the out-of-pocket amounts paid by the bondholders.

We cannot accept the two-tier approach as valid. It is based on an unjustified fiction, and it is not supported by law or reason.

Its most obvious infirmity is that it treats the municipal bondholders as "claimants" and "policyholders." They are neither. It also refers to the out-of-pocket payments for the bonds (or the market price on April 11, 1991, for bonds purchased after that date) as the "consideration" for the Muni-GIC's. They are not.

Section 1023 controls what must be shown for a creditor or policyholder claim to be allowed against the estate of the insolvent insurer. The statute

---

[6]For that reason, this aspect of the plan is alternatively called the "look through" system. The plan uses the term "Nominated Account Value" to describe the aggregate account value established by the system, apparently on the theory that the amount paid for the municipal bonds, originally or on the secondary market, "nominates" (i.e., fixes) the amount to be used in the valuation formula.

requires that a claim based on a contractual obligation declare that the amount claimed is "justly owing from such person [the insolvent insurer] to the claimant" and state "the particulars thereof, and the consideration paid therefor." It is evident that section 1023 means consideration paid by or on behalf of the insured for the insurance contract, not consideration paid in some other transaction by parties not in privity with the insurer.

There can be no serious dispute that the record owners of the municipal bonds issued in 1985 and 1986 to fund the 1986 ELIC Muni-GIC's have no privity of contract with the insolvent insurer and did not pay section 1023 "consideration" to ELIC for the Muni-GIC's.

In *Texas Commerce Bank* v. *Garamendi, supra,* 11 Cal.App.4th 460, we explained in substantial detail what constitutes an insurance annuity under section 101. We concluded that the 1986 ELIC Muni-GIC's are entitled to class 5 "policyholder" claim status against the ELIC estate because they qualify as insurance annuities under section 101. In arriving at this conclusion we examined the relationship between the Muni-GIC's and the underlying "indenture agreements" between the respective trustee banks and municipal entities.

Under the provisions of the Muni-GIC's, ELIC's only contractual obligations were to the trustee banks, as owners, and to the underlying municipal entities, which were designated in the GIC's as the only intended third party beneficiaries. The very terms of the Muni-GIC's state that the indenture trustees are the legal owners of those annuities. The Muni-GIC's expressly disclaim any intent to create any other third party beneficiary or contractual obligation on the part of ELIC. While the underlying bonds were offered to the public with the representation that the municipal entities' obligations would be backed by the security of Muni-GIC's, this did not create a policyholder status in the bondholders or a contractual relationship between bond purchasers and ELIC.

The circumstance that the indenture agreements between the municipal entities and the bank indenture trustees require the banks to pay a portion of the Muni-GIC periodic payments to bondholders for accruing interest on the bonds, and generally subject the agreements to insolvency and bankruptcy laws, does not abrogate the legal status of ELIC as insurer, the trustee banks as the sole Muni-GIC policyholders, or the municipal entities as the only third party beneficiaries under the indentures.

The requirements of section 1023 also are inconsistent with provisions in the plan that municipal bondholders are entitled to share ratably with class 5

priority claimants. Even if bondholders somehow could qualify as claimants on the theory that ELIC owed a debt to the municipal entities that the bondholders could reach, they would be, at best, class 6 general creditors, not entitled to share ratably or at all with the class 5 claimants.[7]

Besides its inconsistency with section 1023, the legal fiction that bondholders are policyholders also is inconsistent with the rationale of equitable distribution required by the controlling statutes and by the *Carpenter* rationale.

■ Sections 1025, 1033 and 1057, read together, manifest the principle that the insolvency trustee has a fiduciary duty to effect a pro rata distribution to all allowed policyholder claimants. Section 1025 controls the allowance of unliquidated claims, but requires that such claims, once proved and allowed, ". . . shall share ratably with other claims of the same class in all subsequent distributions." Section 1033 controls liquidation preferences of allowed claims. Its subdivision (a)(5) gives the same claim priority to "all claims of policyholders of an insolvent insurer that are not covered claims." Section 1057 provides that in insurance insolvency proceedings the Commissioner is deemed to be the trustee for the benefit of all creditors and other persons interested in the estate.

The principle embodied in sections 1023, 1033 and 1057 precludes the Commissioner from disregarding insurance contracts or the policyholders who filed claims based on those contracts. It also precludes him from reducing the value of those contracts in order to achieve objectives extraneous to the entitlements of the policy owners.

■ In fact and in law, the Muni-GIC's, not the municipal bonds, are the policies; the trustee banks, not the bondholders, are the claimants; and the $1.8 billion paid to ELIC by the banks, not the prices paid by bondholders for their bonds, is the "consideration paid" within the meaning of section 1023.

The discrimination against Muni-GIC policyholders by the two-tier system is manifest. They are the only group as to whom the actual purchase

---

[7]We note, also, that the Commissioner's position that bondholders are policyholders is inconsistent with the position taken by the Commissioner in *Texas Commerce Bank* v. *Garamendi, supra*, 11 Cal.App.4th at page 482. In that litigation, which was pending during the briefing in this case, the Commissioner put forward the rationale that Muni-GIC's did not qualify as annuities under section 101 because they were sold to banks and had no human annuitants. That position is inconsistent with the argument he now makes that the banks and the municipalities should be "looked through" to find the true annuitants—the bondholders—many of whom the Commissioner acknowledges to be individual persons.

price paid for an insurance product is disregarded. We have pointed out that the use of this system seriously disadvantages Muni-GIC policyholders relative to other policyholders.

There is not even a claim, much less proof, that the system is necessary to a successful rehabilitation plan. Indeed, the Aurora parties point out that the system "principally affects the rights of policyholders *inter se*," and that they are neutral on the issue. Understandably, they decline to address it.

And, unlike the unsound accident and health policies in *Carpenter*, there is no claim that the Muni-GIC annuities had anything to do with the insolvency of ELIC. Rather, they generated large immediate-premium funds for ELIC and were a relatively high profit product.

The Commissioner claims the two-tier assumption is validated by the broad discretionary powers conferred by section 1043 and the *Carpenter* case, to modify insurance contracts in a rehabilitation. This degree of discretionary authority is not conferred by statute or case law.

■ Section 1043 is the statute expressly authorizing the Insurance Commissioner to "[enter] into rehabilitation agreements." Section 1043 gives no further delineation of the scope of that authority. In view of the related statutes setting forth express parameters for treatment of creditor claims in insolvency proceedings, we must presume that the Legislature intended section 1043's terse statement of rehabilitation authority in the Commissioner to be limited by the general principles explicitly set forth in the comprehensive statutory insurance insolvency scheme. (§§ 1010-1062.)

The Commissioner reads *Carpenter* (10 Cal.2d at p. 329), to permit him "reasonable exercise of the state's police power," provided "the state's action shall be reasonably related to the public interest and shall not be arbitrary or improperly discriminatory."

This reading is correct, but it is confined to the police power of the state as manifested in the insolvency statutes; it does not extend to independent discretionary powers which transcend the parameters set by those statutes.

■ What is left is the claim that the authority to impose a "two-tier" system may be implied from the equitable nature of insurance insolvency proceedings.

It is not disputed that insurance insolvency proceedings are special proceedings controlled by statutory provisions requiring fairness with respect to

allowed claims within the same claim priority class. But no authority has been cited and none has been found conferring discretion to the superior court to approve a valuation scheme that disregards the very insurance policies upon which claims were filed and approved, and disregards the legal owners of the policies who actually paid consideration for their contracts to the insolvent insurer and filed timely claims against the insolvent insurer. Neither is there any statute, other than section 1026.1 (which permits subrogated claims) allowing persons not in privity of contract with the insolvent insurer to share in the estate as class 5 "policyholders." Section 1026 permits a third party to file a section 1023 creditor claim against the insolvent insurer only if that party has a claim against the insolvent's insured and that claim is covered by a *liability* policy.

The "equity" argument is based in large part, if not entirely, on the notion that speculators who purchased municipal bonds at prices less than their par issuance value should not be allowed to profit. There is no showing or even an argument that any of the bond transactions are voidable or illegal in any way. The usual rule is that the buyer of a bond or similar instrument of debt is at least entitled to exercise the right of the seller, into whose shoes the buyer has stepped. There is nothing to suggest that this rule does not apply to bondholders who purchased bonds on the secondary market. Indeed, if it did not, there would scarcely be a secondary market.

The two-tier system vitiates the legal ownership rights of the trustee banks and diminishes by millions of dollars the account values of the Muni-GIC's. This indirectly diminishes the amount of ELIC funds that might ultimately be distributed to the legal owners of the Muni-GIC's and transmitted by them to the issuing municipal entities and their creditors, the current bond-holders (including those who bought at par-value issuance prices or higher). Moreover, it does nothing to reimburse an original bond purchaser who sold at a distressed price.

We find nothing equitable in a system that disregards the very insurance policies upon which claims were filed and approved, disregards the legal owners of the policies who paid for them, and simply redirects a part of their entitlement for reasons unrelated to effectuation of the rehabilitation plan.

Neither law nor equity empowered the Commissioner to impose such a plan, or the court to approve it.[8]

---

[8]Because we hold that the municipal bondholders are not the Muni-GIC policyholders, we need not and do not address petitioner's additional contention that respondent had no jurisdiction to fix the value of underlying municipal bonds presently owned by bondholders

## III

### *The Dual Valuation Method*

The Muni-GIC and Pension GIC petitioners challenge the dual valuation method contained in the rehabilitation plan for determining individual account values. They argue that it is discriminatory and arbitrary in its disparate treatment of substantially similar contracts.

As we have seen, the initial account value for each ELIC contract is critically important because it serves as the basis for all further calculations of benefits due under restructured insurance contracts to consenting policyholders and for payments to opting-out policyholders. Because of this, any inequities in the valuation process result in inequities in the determination of the amount of the policy benefits or payments due for opt-outs.

The *Carpenter* standard that state action be reasonably related to the public interest and not be arbitrary or improperly discriminatory (*Carpenter v. Pacific Mut. Life Ins. Co., supra,* 10 Cal.2d at p. 329) does not require precisely equal treatment in all cases. There are circumstances in which a different treatment may be justified on the basis of proven necessity to preserve the rights of all policyholders. (*Id.* at p. 337.) As we shall demonstrate, the dual valuation plan is not one of them. It is inequitable in its result, and neither the Commissioner nor Aurora has established adequate justification for its unequal treatment of the policyholders it affects.

Under the plan, ELIC contracts which explicitly state an initial accumulation value or an annual account value and a guaranteed interest rate are valued under the "declared rate" method. These include annual premium whole life contracts, single premium life annuity contracts, single premium whole life contracts, Pension GIC's and Muni-GIC's. Each of these contracts is valued by the initial account value (net premiums paid) plus accumulations accrued but unpaid as of the April 11, 1991, insolvency date. The resulting figure reflects the actual accrued value of the contract.

ELIC contracts which state the premuim paid and the benefits promised, but do not explicitly state an accumulation value or a guaranteed interest rate are valued in the plan under an "implied rate" method. Contracts in this category are single premium immediate annuities, allocated qualified retirement annuity contracts, and custom qualified retirement annuity contracts. The account value for these contracts is calculated by taking the total

---

who reside outside California and were not made parties to the underlying judicial proceedings.

projected future benefits to be paid under the contract for the term remaining, discounted to their value on the insolvency date by an "implied" discount (or commutation) rate of 8 percent (the prevailing market rate on the insolvency date) for 10 years (until April 11, 2001), and 6 percent thereafter.

The flaw in this approach is that neither the 8 percent nor the 6 percent discount rate bears any relationship to the contracts to which it is applied. Underlying the pricing of each of these contracts were certain pricing assumptions, including an assumption as to the interest rate which would be earned during the life of the contract. While the interest rate was not included as an express contract term, it was implicit in the contract price. For example, it was established at trial that the future benefits for single premium immediate annuities, one type of implied rate contract, were based on an interest rate which ranged between 9 and 13 percent. These rates are documented in the evidence, and there is no suggestion that any of them is actuarially unsound.

If the actual interest rates underlying the implied rate contracts had been used for the commutation to April 11, 1991, values, the resulting account values would have reflected the actual accumulated worth of the contracts as of the date of the insolvency. Such a valuation would mirror the declared rate valuation. Instead, each account was discounted for the unexpired portion of the contract at a rate lower than the rate at which it was to have accumulated during that period. In other words, it was not discounted enough to accurately establish present value as of the insolvency. The result was to inflate the account value of the implied rate contracts relative to other contracts.

The Muni-GIC purchased by Texas Commerce Bank is an example. It was purchased from ELIC in 1986 for $197,950,000. The contract specified a guaranteed interest rate of 9.11 percent, compounded semiannually, and is therefore classified as a declared rate contract. Valued as of April 11, 1991, under the declared rate method, the account value is $206,960,669. Valued under the implied rate method, the account value is $218,002,810, about 6 percent more than the declared rate value. As this illustration demonstrates, and as real parties in interest concede, the implied rate method yields substantially higher account values for Muni-GIC's and other ELIC contracts than the declared rate method. There is therefore no doubt that the plan results in disparate treatment. The question becomes whether the distinction is justified.

The Commissioner and Aurora argue that the dual valuation method is rationally based and does not improperly discriminate between substantially similar insurance contracts. They advance several justifications for its use.

First, they assert that the method is based upon explicit provisions of the contracts and is as objective as possible. They argue that as to contracts which state accumulation values and guaranteed interest rates (the declared rate contracts), it makes sense to treat those terms as bargained-for provisions and apply them to account value determination. For those contracts without stated accumulation values or guaranteed interest rates (the implied rate contracts), they argue that imposition of contractual terms beyond those the owners bargained for would interfere with the contracts. Thus, they say, the only reasonable alternative is to value these contracts by projecting their total future benefits and commuting that total to present value as of the ELIC insolvency date.

There are several problems with this rationale.

It overlooks the fact that the preeminent, bargained-for feature of the ELIC policies—or any insurance product—is the promise to "indemnify another against loss, damage, or liability arising from a contingent or unknown event" (§ 22) or, in the case of an annuity, the promise to pay money for a certain period of time or a time measured upon the "lives of persons or appertaining thereto." (§ 101; *Texas Commerce Bank* v. *Garamendi, supra,* 11 Cal.App.4th at p. 469.) Dual valuation ignores the substantively similar benefits promised in all of the annuities and focuses instead upon the relatively insignificant formal difference that one group of contracts specifies a guaranteed interest rate and initial accumulation values while the other does not.

It was demonstrated at trial and conceded by the Commissioner's expert that it is possible to value declared rate contracts under the implied rate method, and vice versa. More specifically, it was established that Muni-GIC's may be valued by the implied rate method if the single actuarial assumption is made that the owners would request payment of all interest accrued as of each semiannual payment date.[9]

For example, the 1986 ELIC Muni-GIC's are substantively similar to ELIC single premium immediate annuities such as structured settlement

[9]This is a proper assumption. The Commissioner's actuarial expert was of the opinion that the Muni-GIC's are not immediate annuities because they condition actual payment of guaranteed periodic payments upon a prior request by the owner. But the assumption that the benefits would be requested is manifest since the municipal entities will require these funds to service the bond interest debt and finance projects for which the bonds were issued in the first place.

The need to make basic actuarial assumptions is neither uncommon nor unreasonable. We note that under the implied rate method presented in the plan, it is necessary to make an actuarial assumption that the contract owner will not elect to surrender the contract prior to term.

annuities and lottery annuities. Each is a single premium annuity. Each commences a stream of periodic payments generated by an internal rate of interest. And for each, the stream of promised future benefits is the preeminent feature of the contract. Whether an initial accumulation fund or the effective rate of interest is stated on the face of the contract is of relatively little importance to the policyholder or to the nature of the contract. The contract owners paid a single premium in order to receive a guaranteed future periodic payment of a guaranteed amount; that is the substance and primary function of the contracts. Yet the rehabilitation plan provides different valuation methods for these substantially similar contracts, based solely on whether the accumulation fund and effective rate of interest were stated or implicit in the contract.

Nor is there a computational obstacle to valuing both types of contracts in the same manner. Both Muni-GIC's and single premium immediate annuities promise a similar stream of periodic future benefits that can be computed and commuted to present value with equal accuracy and essentially equal simplicity. Once the initial accumulation fund of an implied rate contract is ascertained by reference to ELIC records and the total future benefits promised by that contract are extrapolated, the effective accumulation rate is easily calculated. This single additional arithmetic step permits contracts with substantially identical benefit streams to be valued by the same method. The Commissioner's actuarial expert conceded on cross-examination that the effective accumulation rate of implied rate contracts could easily be calculated by amortization tables.

■ As to the concern with impairment of contract terms, policyholders of the insolvent company have no constitutional right to a particular form of remedy (*Neblett* v. *Carpenter, supra*, 305 U.S. at p. 305 [83 L.Ed. at p. 189]); and the contracts of the policyholders are subject to modification through reasonable exercise of the state's police power. (*Carpenter* v. *Pacific Mut. Life Ins. Co., supra*, 10 Cal.2d at p. 329.)

■ The second proferred justification is that the dual valuation method accomplishes the purpose of making account value determinations simple and readily understandable to the policyholders. This is difficult to credit. The valuation scheme is complex under any approach, but only a single further arithmetic computation is needed to develop account values based on the interest rates actually used when the contracts were formulated. An approach that uses an interest rate unrelated to the actual cost of the contracts can hardly be said to aid the understanding of the laypersons who own them. As we have discussed, the primary focus of the policyholders is necessarily on the promised benefits they will receive. If it is considered that

the means of calculating the benefits should be manifest, even though the original contracts did not spell them out, that can be accomplished as readily by implying the actual interest rate used in formulating the original policy.

The third justification advanced is that, even though the method selected may not be the most accurate or the fairest, it does not have to be; it is enough if it does not arbitrarily or improperly discriminate as between substantially similar contracts and has a reasonable relationship to the public interest in rehabilitating the insurance business of the insolvent insurer.

We agree with this statement as far as it goes. But while the method selected does not have to be the "best" available, no justification is offered for the substantial discrimination produced in this case between substantially similar contracts. It has not been established that the disparate treatment bears any reasonable relationship to the public interest in rehabilitating the insovent insurer, or that it is necessary to preserve the rights of all the policyholders. (See *Carpenter* v. *Pacific Mut. Life Ins. Co., supra,* 10 Cal.2d at p. 337.)

We do not mean to suggest that an implied actual interest rate is the only valuation method that can be used. There certainly are other ways in which to accomplish a fair and uniform means for valuing each account. For example, *Caminetti* upheld the use of a reserve method under its facts. (23 Cal.2d at p. 108.) We already have noted that, in doing so, the *Caminetti* court said nothing to preclude the possibility that other methods might be appropriate in other cases. (*Id.* at pp. 108-110.)

In the trial court and in this mandate proceeding, petitioners advocated use of the statutory reserve method or uniform application of either the implied rate method or the declared rate method for valuation of all insurance contract claims. Respondent's order approving the rehabilitation plan determines only that the plan is "within the sound discretion of the California Insurance Commissioner acting as Rehabilitator" and that "no provision of the Plan violates any requirement of law and all requirements of due process have been met." We need not and do not undertake to evaluate the various alternative valuation methods which the parties may present in any revised rehabilitation plan, beyond observing again that any plan that is reasonably related to the public interest and which is not arbitrary or improperly discriminatory should suffice. Unfortunately, the dual valuation method applied in this case does not meet these criteria.

IV

*The Liquidation Valuation Date*

The final issue we determine is whether the date ELIC conservatorship proceedings were commenced (April 11, 1991) is an appropriate date

for setting the value of the distributable assets of the insolvent that opting-out policyholders will share.

The selection of the April 11, 1991, conservatorship date, rather than a date closer to the effective date of the rehabilitation plan, relegates opting-out policyholders to share a fund acknowledged by all parties to be billions of dollars less than the value of the ELIC assets when the rehabilitation plan was approved, on July 31, 1992. The value of ELIC's assets as of April 11, 1991, was adjudicated by respondent to be $5.044 billion. The parties dispute the value of the assets at present, but it is agreed that the estate has substantially appreciated (partly due to cessation of payments to most general creditors and reduced interim benefit payments to policyholders) and may amount to $7.6 billion.

The liquidation valuation date is important because it determines the amount of ELIC assets available for *pro rata* distribution among opting-out policyholders. Consequently, it also determines the amount of ELIC assets available to Aurora for purposes of carrying on the business of ELIC through the restructured policies of the opting-in policyholders. A calculation based on the liquidation value of the insolvent estate as of the date of implementation of the rehabilitation plan would increase the portion of ELIC assets available to opt-out policyholders and decrease the portion transferred to Aurora.

The Commissioner and Aurora contend that the April 11, 1991, date set by the plan is authorized by section 1019 and supported by equitable considerations. They also contend that setting the valuation date is a matter within the broad discretion conferred upon the Commissioner, acting as rehabilitator, and upon the superior court by section 1043 and the police power of the state.

We conclude that the valuation date selected cannot be supported.

Section 1019 provides: "Upon the issuance of an order of liquidation under section 1016, the *rights and liabilities* of any such person [the insurer in liquidation] and of creditors, policyholders, shareholders and members, and all other persons interested in its assets . . . shall, *unless otherwise directed by the court*, be fixed as of the date of the entry of the order. . . ." (Italics added.)

The Commissioner and Aurora read the section 1019 reference to "rights and liabilities" as including the determination of the total value of the distributable assets of the insolvent insurer for purposes of liquidation

distribution. They urge that the statute's reference to a court order ("unless otherwise directed by court") confers discretion on the court to select either the date of the liquidation or any other date for the valuation. They conclude that section 1019 authorizes a rehabilitator under section 1043 to select any liquidation valuation date for purposes of determining how much is available for distribution to policyholders opting-out of the rehabilitation.

Real parties' construction of section 1019 rests upon an inappropriate melding of two separate subjects: (1) the existence and valuation of approved individual creditor claims and (2) valuation of the total assets of the insolvency estate available for purposes of distribution in straight liquidation or under a rehabilitation plan.

California cases arising under section 1019 are not helpful. They concern whether a particular claim is allowable against the insolvency trustee at the time the liquidation order or conservation order is filed, or the setoff rights of claimants based on the actual value of mutual obligations between the insolvent and the particular creditor. (See *Prudential Reinsurance Co.* v. *Superior Court* (1992) 3 Cal.4th 1118 [14 Cal.Rptr.2d 749, 842 P.2d 48]; (*Carpenter* v. *Coast Surety Corp.* (1938) 25 Cal.App.2d 209, 211-212 [77 P.2d 294]; *Downey* v. *Humphreys* (1951) 102 Cal.App.2d 323, 331, 337 [227 P.2d 484]; *Mitchell* v. *Pacific Greyhound Lines* (1939) 33 Cal.App.2d 53, 68-69 [91 P.2d 176]; *Kinder* v. *Superior Court* (1981) 125 Cal.App.3d 308, 315 [178 Cal.Rptr. 57].)

None of the other cases cited by real parties on this point addresses the construction of section 1019; they concern the status of allowable claimants, the amount of contract damages, or the amount of permissible setoff. (See *Amer. Surety Co.* v. *Bethlehem Nat. Bank* (1941) 314 U.S. 314, 318 [86 L.Ed. 241, 242-243, 62 S.Ct. 226, 138 A.L.R. 509]; *American Nat. Bank* v. *Federal Dep. Ins. Comp.* (11th Cir. 1983) 710 F.2d 1528, 1540; *Merrill* v. *Commonwealth Mut. Fire Ins. Co.* (1898) 171 Mass. 81 [50 N.E. 519]; *People* v. *Commercial Alliance Life Ins. Co.* (1897) 154 N.Y. 95 [47 N.E. 968]; *Davis* v. *Amma Grotto M.O.V.P.E.R.* (1936) 169 Tenn. 564 [89 S.W.2d 754, 758, 106 A.L.R. 1506]; *Langdeau* v. *Dick* (Tex.Civ.App. 1962) 356 S.W.2d 945, 953, 958.)

Aurora seeks support in *Caminetti* v. *Pacific Mut. Life Ins. Co.*, *supra*, 23 Cal.2d at page 98, for its argument that the insolvency date should be used as the date for valuing the assets to be distributed. *Caminetti* refers to July 22, 1936 (the insolvency date of Pacific Mutual) as "the date as of which their [the opting-out policyholders'] right to damages was fixed." But the *Caminetti* court did not consider the value of the insolvent estate subject to

liquidation distribution to the opting-out policyholders. *Caminetti* considered only "the proper measure of damages" resulting from the breach of the policies brought about by the insurer's insolvency. (23 Cal.2d at pp. 100-105, 108-110.) We find no discussion in *Carpenter,* either, of the issue of valuation date of the insolvent's assets for liquidation purposes. (See fn. 5, *ante.*)

Use of the insolvency date provides an unrealistic result because, in most situations, significant time will pass from the date of the conservation order to the actual liquidation or rehabilitation distribution. If the estate appreciates after the conservation order and straight liquidation is ultimately necessary (when a rehabilitation plan fails or when rehabilitation is not a viable alternative), valuing the estate as of the conservation date will not yield the total net value of the estate available for distribution to claimants. Conversely, if the estate value decreases after entry of the conservation order, valuation of the estate assets as of the date of the conservation order yields a value in excess of that actually available to claimants upon liquidation or rehabilitation distribution. In either case, a second valuation as of the distribution date would be required.

Calculation of the "liquidation" value of assets as of the distribution date of a rehabilitation plan is more functional. It pragmatically fixes total distributable asset value as of the very date the liquidation distribution is actually to occur. No second calculation is required to account for interim fluctuation in the value of the distributable assets.

Contemporaneous valuation of assets also is consistent with the method employed in the analogous area of bankruptcy. ■ Principles of bankruptcy law may be considered as instructive in the context of insurance insolvency where analogous procedures and issues are concerned. (*Prudential Reinsurance* v. *Superior Court, supra,* 3 Cal.4th 1118, 1131; *Webster* v. *Superior Court* (1988) 46 Cal.3d 338, 349, text and fn. 8 [250 Cal.Rptr. 268, 758 P.2d 596].)

In bankruptcy law, creditor claims are allowed in the amount owing "as of the date of the filing of the petition . . . ." (11 U.S.C. § 502(b).) In chapter 11 proceedings, which are analogous to insurance rehabilitations, plans must provide each creditor with at least the amount he or she would receive if the

liquidation value of the estate assets were calculated on "the effective date of the plan . . . ." (11 U.S.C. § 1129(a)(7).)[10]

■ The Commissioner's reliance upon section 1019 is also inconsistent with the other provisions controlling conservation and liquidation of an insolvent insurer.

The Commissioner is, pursuant to section 1057, the trustee of all the assets of the insolvent ELIC for the benefit of all ELIC "allowed" policyholder claimants. Pursuant to section 1025, the Commissioner, as rehabilitator, is under a duty to collect assets and distribute them *ratably* as between claimants within the same section 1033 claim priority. The plan breaches the Commissioner's fiduciary duty to distribute assets pro rata by relegating certain policyholders (opt-outs) to share a fund of lesser value than the fund to be shared by other policyholders (opt-ins) in the same creditor priority class.

The Commissioner and Aurora also contend that April 11, 1991, is the appropriate "liquidation" valuation date for the insolvent insurer's assets because, since that date, the efforts of the Commissioner have been directed toward effecting a rehabilitation plan providing continuation of policy benefits to ELIC policyholders and greater recovery than could have been realized in a straight liquidation pursuant to section 1016.

From this they argue that policyholders who elect not to participate in the section 1043 rehabilitation plan, which was formulated by the Commissioner and approved by respondent approximately 14 months after commencement of the conservation proceedings, are not entitled to share in the accumulated value of the insolvency estate during that period. Instead, the plan would treat policyholders who elect not to accept restructured insurance contracts as if no rehabilitation plan were ever effected. They are not permitted to share in either the benefits or the burdens of the rehabilitation.

In contrast, it is argued, policyholders who agree to accept restructured policies under the plan deserve to have their restructured policy benefits calculated on the basis of the total value of the estate as of the effective date of the rehabilitation plan (estimated to be approximately $2 to $3 billion greater than the April 11, 1991, value).

The problem with this rationale is that it assumes that policyholders had a choice at the time the assets of ELIC were taken over on April 11, 1991. The

---

[10]See *Commissioner of Insurance* v. *Mass. Accident Co.* (1943) 314 Mass. 558 [50 N.E.2d 801, 807, 811] (opt-outs in an insurance rehabilitation should have shares determined as of the approval date of the plan).

fact is that, with very limited exceptions,[11] all ELIC policyholders were compelled to wait over 14 months while the rehabilitation plan was being formulated and offered for court approval. They are still waiting. It is only when the plan is known that policyholders can intelligently determine whether to opt in or opt out. In the meantime, all policyholders were subjected to the same risk that the ELIC estate would depreciate in value by the time a plan was formulated and approved. There is no rational basis to penalize policyholders who are dissatisfied with the eventual plan on the theory that they are ungrateful dissidents who bore no risk of depreciation of the estate and deserve no share of the accumulations.[12]

### DISPOSITION

Let a peremptory writ of mandate issue directing respondent to vacate its order/judgment of July 31, 1992, and to proceed according to law.

The modified temporary stay order issued by this court on December 2, 1992, and modified on December 15, 1992, shall remain in effect until 10 days after the time for filing a petition for review has run.

Woods (A. M.), P. J., and Taylor, J.,* concurred.

A petition for a rehearing was denied April 16, 1993.

---

[11]The exceptions were for certain interim benefit payments and death benefits.

[12]Because of our conclusion that the insolvency date cannot be used in this case as the date to fix the value of the share of assets to be paid to opt-outs, we do not reach the further challenge that it is improper to base the value on the amount that could have been realized if the assets had to be sold on a "distress sale" basis within a 90-day period.

*Judge of Los Angeles Superior Court sitting under assignment by the Chairperson of the Judicial Council.