18 F.3d 1527
 Francis M. LEVERSO, Elaine E. Leverso, Frank Klevitz, Mary
Klevitz, Plaintiffs-Counter-Defendants-Appellees,
Stephen D. Lieberman, Marlene F. Lieberman, Henry E. Cohen,
Joanna S. Cohen, Daniel B. Morgan, J.B. Morgan, Norman L.
Grier, Louella Boucher, Investments Nationale Limited
Partnership, A Florida limited partnership; individually
and on behalf of all others similarly situated, Plaintiffs,
Rudolph Hajek, Jean Hajek, Plaintiffs-Counter-Defendants,
v.
SOUTHTRUST BANK OF AL., NAT. ASSOC.,
Defendant-Counter-Claimant-Appellee,
Wheeler Bondholders, Claimant-Appellant,
Shearson Lehman Hutton, Inc., Movant.
 No. 93-6017.
 United States Court of Appeals, Eleventh Circuit.
 April 15, 1994.
 
 Frank O. Burge, Jr., Burge & Wettermark, Birmingham, AL, Robert M. Sedgwick, Holtzmann, Wise & Shepard, New York City, for claimant-appellant.
 Robert H. Rutherford, Burr & Forman, Birmingham, AL, Frank M. Wilson, Landis Sexton, Beasley, Wilson, Allen, Main & Crow, Montgomery, AL, for defendant-counter-claimant-appellee.
 Appeal from the United States District Court for the Northern District of Alabama.
 Before BLACK, Circuit Judge, JOHNSON and HENDERSON, Senior Circuit Judges.
 BLACK, Circuit Judge:
 
 
 1
 Following a Florida development district bond default, class representatives of the class action suit underlying this appeal entered into a settlement agreement on behalf of the bondholders, the trustee of the bond proceeds, and other third parties. The agreement included a distribution plan that allocated the net settlement funds among the bondholders according to a pro rata share of the bondholders' cost basis, or the amount each bondholder paid for the bonds. Under this plan, bondholders who paid a higher amount for their bonds during the initial offering would receive a larger settlement than bondholders who paid a lesser amount in the secondary market after the initial offering and after the default. The district court approved the settlement agreement, including the distribution plan. Members of the class who had purchased their bonds in the secondary market at substantially lower prices objected to the distribution plan in the district court and now appeal the district court's approval of it.[1] We hold that the distribution plan is contrary to the bond trust indenture's governing terms and vacate the district court's approval of the distribution plan.
 
 I.
 
 2
 This appeal had its genesis in the late 1970s, when a large condominium project was planned for Palmetto, Florida. Improvements to the land were to be financed through tax-free bonds issued by the Palms of Terra Ceia Bay Community Development District (CDD or district), which was created in late 1982 pursuant to Chapter 190, Florida Statutes.[2] SouthTrust Bank of Alabama was chosen as indenture trustee to administer the bond proceeds.
 
 
 3
 The CDD issued $11,500,000 in Special Assessment and General Obligation Capital Improvement Bonds, Series 1983, dated March 1, 1983. The bonds were issued pursuant to a resolution of the district and an "Indenture of Trust" (trust indenture) between the district and SouthTrust. They were secured by a pledge of revenues from special assessments and ad valorem taxes to be levied against the properties within the district. The land for the improvements was purchased by the CDD with a portion of the bond proceeds. The district's authority to levy the taxes, however, was conditioned on completion of the improvements--such as a golf course, clubhouse, water and sewage systems, streets, landscaping, and street lighting--so that the property to be taxed was benefitted.
 
 
 4
 The development project subsequently failed, defaulting on its interest payments and spawning numerous lawsuits in state and federal court. The suit from which this appeal arose was a class-action suit on behalf of all bondholders[3] against the indenture trustee, SouthTrust Bank. Mediation during the class action suit led to the settlement agreement approved by the district court. The settlement encompasses all parties to all the lawsuits.[4]
 
 
 5
 The settlement agreement provided for a $2.5 million cash distribution to all persons holding bonds as of the record date.[5] The distribution plan provides in relevant part:
 
 
 6
 6. Disbursement of Proceeds. The proceeds of the Settlement Fund shall be disbursed to the Bondholders in such manner as shall be determined by the Court. The parties shall recommend to the Court the following plan of Distribution:
 
 
 7
 ....
 
 
 8
 (iii) The remainder of the Settlement Fund [after 6(i) and 6(ii) deductions] shall be disbursed to the Bondholders proportionately according to the "Cost Basis" of each said Bondholder in the Bonds which it owns as of the Record Date.... "Cost Basis" shall be that amount, net of premiums, accrued interest, discounts, or other adjustments, actually paid by each Bondholder for the Bond or Bonds which he or she owns. Commissions paid to underwriters and brokers in connection with the purchase shall be included in Cost Basis. Each Bondholder shall receive an amount equal to the sum determined by applying to the total amount of the Settlement Fund remaining after deduction of [6(i) and 6(ii) amounts] ... a fraction the denominator of which is the total amount of all claims submitted by all Bondholders (and allowed by the Court) and the numerator of which is the claim submitted by said Bondholder.
 
 
 9
 Notwithstanding the foregoing, no Bondholder shall be entitled to receive an amount in excess of his Cost Basis in his Bond(s)....
 
 
 10
 7. Allocation of Bondholder Payments; Surrender of Bonds; Coupons. The Settlement Fund shall be applied in the manner set forth in the preceding paragraph as a payment of principal only and without payment for or on account of any interest due to the Bondholders with respect to the Bonds, without preference or priority of any Bond over any other Bond, ratably, according to the amounts available therefor in the Settlement Fund, without discrimination or privilege....
 
 
 11
 The settlement agreement provided that all of its terms, including the manner of disbursement of the settlement fund, were subject to court approval. Settlement Agreement p 18. It further required that any questions or issues relating to the distribution plan be submitted to the court. A severability clause stipulated that:
 
 
 12
 [A]ll questions relating to the distribution shall be entrusted to the Court for its decision in accordance with the general equitable powers of the Court. Any appeal or dispute which may arise concerning ... the Plan of Distribution ... shall not be grounds for delay in the entry of a Final Judgment approving this Settlement Agreement....
 
 
 13
 Id. at p 19. Pursuant to that clause, only the distribution plan approved by the district court was appealed. Consequently, we do not address the remainder of the settlement agreement as it was approved by the district court.
 
 II.
 
 14
 In order to approve the settlement agreement, the district court was required to determine that it was fair, adequate, reasonable, and not the product of collusion. Bennett v. Behring Corp., 737 F.2d 982, 986 (11th Cir.1984). This Circuit has outlined several factors useful in making that determination. See, e.g., Holmes v. Continental Can Co., 706 F.2d 1144, 1147-49 (11th Cir.1983); In re Corrugated Container Antitrust Litig., 643 F.2d 195, 213 (5th Cir.1981). The district court thoroughly addressed six factors[6] and ruled that each weighed in favor of settlement. We review the district court's approval of the settlement agreement for abuse of discretion. Id. at 207.
 
 
 15
 In our review, we must determine whether the district court's approval was "based on adequate and careful analysis of 'the facts of the case in relation to the relevant principles of applicable law.' " Corrugated Container, 643 F.2d at 212 (quoting Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir.1977)). The gravamen of this appeal, whether the distribution plan approved by the district court is contrary to the bondholders' rights under the governing trust indenture, is founded on construction of the trust indenture. Construction of a trust indenture is a question of contract law and interpretation, over which this Court has plenary authority. Broad v. Rockwell Int'l Corp., 642 F.2d 929, 940, 948 (5th Cir. Apr.) (en banc), cert. denied, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981).[7]
 
 
 16
 Initially, we note that as part of the district court's assessment of the legal arguments and the substance of the opposition to the settlement, see supra note 6, the court rejected Appellants' stated opposition to the distribution plan without applying the bonds' governing trust indenture or the applicable principles of contract law. Bondholders' rights are a matter of contract, governed by the trust indenture and general principles of contract law. Broad, 642 F.2d at 940-41 & n. 10; see generally id. at 940-46; American Bar Foundation, Commentaries on Indentures at 2 (1971) (Commentaries ). Indeed, trust indenture boilerplate provisions, such as those at issue in this appeal, were developed in order to standardize debenture indenture contractual rights and provide uniformity to the financial market. Commentaries at 1-3. It is therefore imperative that the terms of the indenture govern the parties' contractual rights as determined by the judiciary. E.g., Broad, 642 F.2d at 940-46; Metropolitan Life Ins. Co. v. RJR Nabisco, Inc., 906 F.2d 884, 889-91 ("We concede without apology that we believe contract provisions specifying 60-day periods mean 60 days rather than 60 days plus an additional period calculated by the length of the chancellor's foot."); see also Katz v. Oak Indus. Inc., 508 A.2d 873, 880-82 (Del.Ch.1986).
 
 
 17
 The district court therefore abused its discretion when it failed to apply the terms of the governing trust indenture and settled principles of contract law in assessing whether the settlement agreement was fair, adequate, and reasonable. Nonetheless, because the law favors settlement, we may affirm the district court's approval unless the distribution plan is invalid as a matter of law. Cf. Bennett, 737 F.2d at 987 ("[U]nless the illegality of an arrangement under consideration is a legal certainty, [there] is no bar to approval.").
 
 III.
 
 18
 The district court approved the distribution plan upon the following rationale:
 
 
 19
 [T]he unfortunate truth of this settlement is that everyone who purchased these bonds will suffer economically. The Settlement Fund is not sufficiently large so that every bondholder can be paid his or her out-of-pocket loss let alone the face amount of the $11.5 million bond issue. The proposed plan of distribution will return a pro rata portion of out-of-pocket loss to all bondholders. The proposed cost/out of pocket expense distribution treats all bondholders fairly and equitably.
 
 
 20
 The speculators want the bondholders who purchased the bonds prior to default to effectively subsidize the speculators' decision to buy the bonds at the speculative, reduced price. Under the proposed distribution, however, the burden of the default will be suffered by all bondholders pro rata. This is a completely evenhanded methodology.
 
 
 21
 Although this Court considers its responsibility to be to determine whether the proposed plan of distribution is fair and reasonable to these class members, the speculator objectors are also wrong to suggest that the proposed plan of distribution will adversely affect the secondary market. When a speculator buys a deeply discounted bond in default he takes a large risk with the hope of obtaining a large reward. Had this matter resulted in a $10 million settlement rather than the $2.5 million settlement, these speculators would have profited handily. The proposed settlement is not large enough to repay the losses suffered by all bondholders. That is a part of the risk that the speculators took when they purchased defaulted bonds. However, as long as the potential for enormous gains is present there will be a secondary market for defaulted issues.
 
 
 22
 [T]he Court believes that the only fair and equitable distribution is to return to each bondholder a pro rata share of his or her loss through investment in these bonds. In this Court's opinion it would be totally inequitable to distribute the proceeds according to the face value of the bonds and thereby allow speculators who purchased these bonds with full knowledge of substantial risk and at a deep discount to profit while original purchasers who purchased what was thought to be a safe, low risk investment suffer substantial losses.
 
 
 23
 As legal support for its ruling, the district court relied on other cases in which similar cost basis distribution plans had been approved. The court noted first that in 10b-5 litigation, 15 U.S.C. Sec. 78j(b), including securities class action suits, if some stockholders of a liquidated corporation have not paid in full for their stock, they are entitled to share in the net liquidation proceeds only to the extent of their payments. Alley v. Miramon, 614 F.2d 1372, 1387-88 & n. 33 (5th Cir.1980). Turning to class action bond default cases, the court relied on In re Washington Public Power Supply System Securities Litig., 720 F.Supp. 1379 (D.Az.1989), aff'd sub nom. Class Plaintiffs v. City of Seattle, 955 F.2d 1268 (9th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 408, 121 L.Ed.2d 333 (1992), and on South Carolina National Bank v. Stone, 749 F.Supp. 1419 (D.S.C.1990), as establishing legal precedent for permitting a class action settlement distribution calculated on the bondholders' cost basis. We discuss these cases in section III.A., below.
 
 
 24
 On appeal, Appellees reiterate the district court's reasoning and vigorously assert that the district court did not abuse its discretion in approving the settlement agreement because it was not bound solely by the trust indenture. In support of that proposition, they point to the bond default cases relied upon by the district court as well as cases that give a district court generally broad discretion in approving settlement agreements. Appellees contend, too, that the trust indenture requires equal treatment of all bondholders, not of all bonds. Under the terms of the approved distribution plan, their argument continues, each bondholder is treated equally because the same formula is used to calculate the distribution to each bondholder.
 
 
 25
 In contrast, Appellants assert that the distribution plan is contrary to the express terms of the governing trust indenture, which provide for equal treatment among all bonds regardless of when or for what amount the bonds were purchased. They emphasize that the standardized nature of the indenture's terms, including the very right to bring suit in the event of default relied on by the bondholders in this case, is critical to the effective functioning of the financial community, indenture trustees, and governmental regulators. By approving a novel interpretation of standardized language, their argument continues, the district court flaunts long-established, consistent, and uniform interpretation of indenture terms that ensures the health and stability of bond markets. In particular, they rely on authorities such as the Commentaries and the Uniform Commercial Code (UCC) to show that it is well established that all rights and remedies of the indenture are contractual and are for the equal and ratable benefit of all the bondholders.
 
 A.
 
 26
 We must determine whether, under the terms of the trust indenture, it would be per se erroneous to permit a distribution of settlement funds according to each bondholder's cost basis. There is little precedent to guide our decision.[8] Appellants have not cited a case that directly construes boilerplate indenture provisions to determine whether a cost-basis settlement fund distribution plan is valid, nor have we located any. Moreover, the cases relied upon by the district court are factually distinguishable in important ways that make them inapplicable as persuasive authority here, as we show below.
 
 
 27
 In Class Plaintiffs v. City of Seattle, 955 F.2d 1268 (9th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 408, 121 L.Ed.2d 333 (1992), the Ninth Circuit affirmed the district court's approval of a class action settlement agreement arising out of the nation's largest bond default. In that case, the Washington Public Power Supply System (WPPSS) entered into agreements with eighty-eight public utilities through which each utility purchased a percentage of the project capability of two nuclear power plants being built by WPPSS. Bonds in the amount of $2.25 billion were issued over five years, until construction was terminated on January 22, 1982, with neither power plant close to completion. Nonetheless, under the terms of the purchase agreements, the public utilities would have been required to commence payments to WPPSS one year after the termination, regardless of the operating status of the power plants.
 
 
 28
 Instead, the Washington Supreme Court held on June 15, 1983, that some of the public utilities did not have authority to enter into the agreements. In a later appeal, that court held that the remaining agreements between the public utilities and WPPSS were unenforceable. All public utilities were therefore released from their payment obligations under the agreements. Id. at 1273-74.
 
 
 29
 In consolidated class actions alleging various common law and securities law violations in connection with the sale of the bonds, two subclasses of bondholders were certified according to those who purchased their bonds prior to the termination and those who purchased their bonds after the termination. Id. at 1274. Bondholders who purchased their bonds after June 15, 1983, were outside the class boundary date, id. at n. 2, but were part of the consolidated suit and the single allocation plan, id. at 1283-84. The allocation plan established an "allowable loss" calculated by the difference between the purchase price and the actual or imputed selling price. In re Washington Pub. Power Supply Sys. Sec. Litig., 779 F.Supp. 1063, 1098 n. 24 (D.Ariz.1990).
 
 
 30
 A defining feature of the WPPSS litigation was the Washington Supreme Court's opinion of June 15, 1983, that "effectively informed the world that the [public utilities'] guarantee that they would repay investors was worthless. Investors who purchased ... bonds after that day did so with knowledge that there was no 'guaranteed' source of payment of the principal and interest on the bonds." Class Plaintiffs, 955 F.2d at 1276 (quoting 720 F.Supp. at 1420). Thus, investors who purchased after that day knew with a legal certainty when they purchased the bonds that repayment would not be forthcoming.[9] In this case, in contrast, no court had "effectively informed the world" that payment obligations had been rendered a legal nullity. We consider the legal opinion nullifying repayment obligations a dispositive distinction between the WPPSS litigation and this case.
 
 
 31
 The settlement in the bond default case of South Carolina National Bank v. Stone, 749 F.Supp. 1419 (D.S.C.1990), was distributed according to each bondholders' cost basis in the bonds. Again, a dispositive factor distinguishes approval of that distribution plan from the one before this Court: no objection was raised to the plan, so the district court did not have occasion to determine whether a cost basis distribution comported with the terms of the trust indenture.
 
 
 32
 In any event, in this Circuit the terms of the trust indenture govern the parties' rights under default. Broad, 642 F.2d at 948. Thus, even were we to consider the WPPSS and Stone cases persuasive authority for the permissibility of some kind of cost basis formula for distributing the settlement proceeds, we still must construe the terms of the governing trust indenture in order to determine whether the cost basis distribution in this case breaches the terms of the trust indenture and is invalid as a matter of law.
 
 B.
 
 33
 Although the district court's rationale seems intuitively equitable, under universal contract principles judicial equitable notions cannot override unambiguous contractual rights. E.g., Home Dev. Co. v. Bursani, 178 So.2d 113, 114, 116-118 (Fla.1965).[10] It is well settled that a court cannot rewrite the terms of a contract in an attempt to make otherwise valid contract terms more reasonable for a party or to fix an apparent improvident bargain.
 
 
 34
 Under general principles of contract law, we look to the four corners of the instrument to determine the intent of the parties. E.g., Broad, 642 F.2d at 948. However, boilerplate provisions such as those at issue here, which are found in virtually all indentures, "do not depend upon particularized intentions of the parties to an indenture." Sharon Steel Corp. v. Chase Manhattan Bank, 691 F.2d 1039, 1048 (2d Cir.1982), cert. denied, 460 U.S. 1012, 103 S.Ct. 1253, 75 L.Ed.2d 482 (1983). The meaning of boilerplate provisions is a matter of law and must be given a consistent, uniform interpretation, see Commentaries at 3, "whether it be correct or not as an initial proposition," Sharon Steel, 691 F.2d at 1048. We conclude for the following reasons that the governing trust indenture, as construed under general principles of contract law, does not permit the settlement proceeds to be distributed according to the bondholders' cost basis.
 
 
 35
 The plain language of several sections of the trust indenture, including the default section, unambiguously provides for each bond to be treated as every other bond. Nowhere in the trust indenture are distinctions made according to when the bond was purchased, the amount that was paid, or the circumstances under which it was purchased. Indeed, the terms of the trust indenture repeatedly state that no priority or distinction is to be made among the bonds. The granting clause, for example, sets forth the trust:
 
 
 36
 for the equal and proportionate benefit, security and protection of all present and future holders and owners of the Bonds, from time to time, issued under and secured by this Indenture without privilege, priority or distinction as to the lien or otherwise of any of the Bonds over any of the others of the Bonds.
 
 
 37
 (Emphasis added.)
 
 
 38
 Sections of Article IX, "Default Provisions and Remedies of Trustee and Bondholders," likewise state that no bond is to be privileged over another. For example, section 905, "Application of Moneys," states that:
 
 
 39
 All moneys received by the Trustee pursuant to any right given or action taken under the provisions of this Article shall, after payment of the cost and expenses of collection ... be applied:
 
 
 40
 (1) Unless the principal of all the Bonds shall have become due and payable, all such moneys shall be applied:First: To the payment of all installments of interest then due on the Bonds, in the order of the maturity of the installments of such interest and, if the amount available shall not be sufficient to pay in full any particular installment, then to the payment ratably, according to the amounts due on such installment, to the persons entitled thereto, without any discrimination or privilege; and
 
 
 41
 Second: To the payment of the unpaid principal of and premium, if any, on any of the Bonds which shall have become due (other than Bonds called for redemption for the payment of which moneys are held pursuant to the provisions of this Indenture), in order of their due dates, with interest on such Bonds from the respective dates upon which they become due and, if the amount available shall not be sufficient to pay the full Bonds due on any particular date, together with such interest, then to the payment ratably, according to the amount of principal due on such date, without any discrimination or privilege.
 
 
 42
 (2) If the principal of all the Bonds shall have become due all such moneys shall be applied to the payment of the principal and interest then due and unpaid upon the Bonds, without preference or priority ... of any Bond over any other Bond, ratably, according to the amounts due respectively for principal and interest, without any discrimination or privilege.
 
 
 43
 (Emphasis added.)
 
 
 44
 Appellees point to language referring to bondholders rather than bonds, however, as meaning that the trust indenture establishes equal treatment for all bondholders, not for all bonds. For example, the granting clause quoted above contains the language "for the equal and proportionate benefit, security and protection of all present and future holders and owners of the Bonds." Similarly, section 906, "Remedies Vested in Trustee," states that the trustee may enforce all rights of action under the indenture and that "any recovery of judgment shall be for the equal benefit of the holders of the outstanding Bonds." Section 907, "Rights and Remedies of Bondholders," states that "all proceedings at law or in equity shall be instituted, had and maintained in the manner herein provided and for the equal benefit of the owners of all Bonds then outstanding."
 
 
 45
 We consider Appellees' proposed distinction between the terms "bond" and "bondholder" to be a distinction without a meaningful legal difference. It would seemingly go without saying that all rights vest in the bondholders only because they have purchased the bonds; and they purchased bonds whose identical features were detailed in the trust indenture. In essence, Appellees want the meaning of "equal benefit" in these provisions to carry with it the implied qualifier "according to the circumstances of the purchaser." That is, they give contractually meaningless characteristics of the bondholders--when they purchased the bonds and for how much--precedence over the explicit terms of the bonds themselves. This implied qualifier, of course, would permit some bonds to be privileged over other bonds, in direct contradiction to the bonds themselves, which vary not at all according to whether they were purchased during the initial offering or on the secondary market.
 
 
 46
 When read in pari materia with the remainder of the indenture, the only reasonable resolution of the meaning of these provisions is to treat the bondholders equally by treating each bond equally. The terms and features of the bonds purchased by Appellees are identical to those of the bonds purchased in the secondary market. The face value of the bonds purchased in the secondary market did not change from the face value of the initial offering; nor did the terms of the trust indenture. Each bond is identical, regardless of the circumstances of its purchase and its purchaser. Equal treatment of the bonds, and thereby of the bondholders, does not result from distinguishing the bonds according to when they were purchased and for how much.
 
 
 47
 We see no provision in the trust indenture for distinguishing among bonds according to any criterion, and we take heed of the Second Circuit's admonishment to interpret terms of a trust indenture according to the contract terms, not "judicial views as to what terms might be preferable." RJR Nabisco, 906 F.2d at 889. As we read the terms of the contract, it does not permit carving a distinction among the bonds according to the amount paid for each bond, regardless of how equitable that approach may seem.[11]
 
 
 48
 Moreover, it strains the plain meaning of the contractual term "ratably" as used in the trust indenture to interpret it as "ratably to the amount paid for the bond." Appellees' contention that applying the same formula to each bondholder creates equal treatment proves too much. That position, if indeed valid, would hold for any formula and lose all meaning. Equal treatment does not result merely by applying the same formula--any formula--to each bondholder. Instead, the question "ratably to what" must be answered within the four corners of the contract. In this case, the trust indenture calls for proportional payment according to the amount due for principal and/or interest, without any discrimination or privilege. A cost-basis proportional distribution cannot be reconciled with the clear terms of the trust indenture.
 
 
 49
 Accordingly, we vacate the district court's approval of the distribution plan and remand for modification of the distribution plan in the settlement agreement in accordance with this opinion.
 
 
 50
 VACATED and REMANDED.
 
 
 
 [1]
 Appellants also contend on appeal that they were not adequately represented by the class representatives in the development of the distribution plan during settlement negotiations. Because we resolve the appeal based on the distribution plan itself, we do not address the second issue
 
 
 [2]
 Community development districts are independent special districts created pursuant to state law in order to manage and finance basic community development services, in particular capital infrastructure. Such districts do not have zoning or development permitting powers. See Fla.Stat. Ch. 190
 
 
 [3]
 The district court certified the class and created two subclasses. Subclass A included all persons who owned bonds at the time the class was certified. This subclass did not have "opt-out" privileges. Subclass B included bondholders who had purchased their bonds prior to January 1, 1985, and who still owned bonds at the time the class was certified. The bondholders in Subclass B were given the opportunity to request exclusion
 
 
 [4]
 Notice of the settlement agreement was sent to bondholders by first class mail in October 1992. After receiving objections, including the same objections raised on appeal by Appellants, the district court held a hearing in November 1992 to consider the objections
 
 
 [5]
 The total settlement was $3 million, including SouthTrust's waiver of over $500,000 in fees. In addition, all funds held by SouthTrust representing interest payments to bondholders for interest coupons due and payable on or before March 1, 1978, for which the coupons had not been presented to SouthTrust, were added to the settlement fund. The adequacy of the amount of the settlement is not on appeal
 Under the terms of the settlement, the class was expanded to include, and therefore bind, all persons who then owned bonds and the bonds were canceled.
 
 
 [6]
 The district court looked at the following factors: (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of Plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and the substance and amount of opposition to the settlement
 
 
 [7]
 In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981
 
 
 [8]
 We do note that in the bankruptcy context--a context that, together with securities and 10b-5, we consider inapplicable here due to the statutory basis of those causes of action--the Supreme Court rejected a similar argument. In Manufacturers Trust Co. v. Becker, 338 U.S. 304, 305, 70 S.Ct. 127, 128, 94 L.Ed. 107 (1949), a creditor objected to the allowance of claims equal to the principal amount of a debtor's bonds that were acquired at a deep discount during the debtor's insolvency. The Supreme Court rejected the creditor's assertion that the circumstances of the bonds' purchase required limiting the claims to the cost of the debentures plus interest. Id. at 305, 313-314, 70 S.Ct. at 129, 133
 
 
 [9]
 Moreover, the district court in the WPPSS litigation had ruled that the bondholders who purchased after the date of the Washington Supreme Court opinion did not receive an automatic assignment of any fraud and tort claims. It had also dismissed all contract and securities-based claims attempting to make the public utilities liable for WPPSS' obligations. These decisions effectively rendered the late-purchasing bondholders, who were not members of the class, without a cause of action to pursue. See Class Plaintiffs, 955 F.2d at 1284-85. In this case, no objections to whether certain claims were available to the secondary market purchasers were raised before the district court, nor do we address such an issue
 
 
 [10]
 The indenture provides that it is governed by applicable Florida law. Indenture of Trust Sec. 1209
 
 
 [11]
 In rejecting an equity approach similar to the district court's approach in this case, a California appeals court recently echoed the Supreme Court's rationale from Manufacturers Trust, supra note 8, when it stated, "The 'equity' argument is based in large part, if not entirely, on the notion that speculators who purchased municipal bonds at prices less than their par issuance value should not be allowed to profit. There is no showing or even an argument that any of the bond transactions are voidable or illegal in any way. The usual rule is that the buyer of a bond or similar instrument of debt is at least entitled to exercise the right of the seller, into whose shoes the buyer has stepped. There is nothing to suggest that this rule does not apply to bondholders who purchased bonds on the secondary market." Commercial Nat'l Bank v. Superior Court, 14 Cal.App.4th 393, 411, 17 Cal.Rptr.2d 884, 895 (1993)