[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Paul Cheatham I.R.A. v. Huntington Natl. Bank,* Slip Opinion No. 2019-Ohio-3342.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2019-OHIO-3342

PAUL CHEATHAM I.R.A., APPELLEE, *v.* HUNTINGTON NATIONAL BANK, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Paul Cheatham I.R.A. v. Huntington Natl. Bank,* Slip Opinion No. 2019-Ohio-3342.]

*Bondholder's right to sue—R.C. 1308.16—Uniform Commercial Code 8-302— Under R.C. 1308.16, absent a valid assignment of a right to bring a cause of action, the sale of a municipal bond does not automatically vest in the purchaser all causes of action the seller had the right to bring relating to the bond—Class action—Civ.R. 23—Commonality—Class action not viable.*

(No. 2018-0184—Submitted February 19, 2019—Decided August 22, 2019.)

APPEAL from the Court of Appeals for Lucas County, No. L-16-1292, 2017-Ohio-9234.

_____

**STEWART, J.**

{¶ 1} This case presents a question of first impression regarding the rights of a bondholder to seek redress for injuries suffered by a prior holder of the bonds. At common law, only the person who suffered the injury can, absent assignment of a chose in action, seek redress for the injury. The Sixth District Court of Appeals found a statutory exception to the common-law rule for securities under R.C. 1308.16(A) (Ohio's codification of Uniform Commercial Code ("UCC") 8-302), which states that "a purchaser of a certificated or uncertificated security acquires all rights in the security that the transferor had or had power to transfer." The court of appeals held that this statute allows a purchaser of a bond to assert a breach-of-contract claim that accrued before the bondholder's purchase because the purchaser acquired the rights of one who held the bond when the breach allegedly occurred. For the reasons explained below, we reverse the judgment of the court of appeals.

{¶ 2} A chose in action is personal in nature and, absent assignment, cannot be asserted by another. R.C. 1308.16(A) does not automatically assign rights to a purchaser upon a transfer of title—it does nothing more than set forth the rule of securities that the purchaser takes all rights in the thing transferred that the seller had the power to give ("shelter rule"). We hold that absent a valid assignment of a right to bring a cause of action, the sale of a municipal bond does not automatically vest in the purchaser, by operation of R.C. 1308.16, all causes of action the seller had the right to bring relating to the bond.

{¶ 3} Additionally, the language of the trust indenture in this case—the agreement in the bond contract made between a bond issuer and the indenture trustee—does not provide an independent basis for bypassing the common law rule against automatic assignment of claims. Language stating that "actual ownership of the bond is a condition precedent to the maintenance of a cause of action that arises under the Trust Indenture" does not automatically transfer a right to a cause

2

of action that accrued to a prior bondholder—it merely limits the rights of third-party beneficiaries.

**Facts**

{¶ 4} In 1998, Lucas County issued $6.59 million in revenue bonds to back construction of the Villa North Health Care and Rehabilitation Center. The parties agree that Lucas County was the lessor and, technically, the obligor on the bonds in order to make them exempt from federal taxes. The bonds, however, were not an obligation of the county: the actual obligor (and lessee) was the Foundation for the Elderly, Inc. Lucas County had to pay only those receipts that it had received from the Foundation for the Elderly. Appellant, Huntington National Bank, entered a trust indenture with Lucas County in which it agreed to collect payments on the bonds and distribute funds, whether principal or interest, to the bondholders.

{¶ 5} The project had its difficulties. In June 2003, Huntington informed the bondholders that the obligor and lessee had defaulted on approximately $420,000 in principal and interest payments. A new entity, Benchmark Healthcare of Toledo, Inc. ("Benchmark"), assumed the lease but defaulted in December 2003. In May 2004, Huntington informed the bondholders that Benchmark had filed for reorganization under Chapter 11 of the Bankruptcy Code. Benchmark filed an amended reorganization plan in December 2007, but by July 2009, reorganization had failed. The bankruptcy was dismissed, and Huntington filed a foreclosure action against Benchmark.

{¶ 6} Appellee, Paul Cheatham I.R.A. ("Cheatham IRA"), alleged that beginning in 2003, it began purchasing the bonds. This was a potentially risky investment strategy: identify distressed, nontaxable bonds and buy them at a discount with the hope that any problems that had caused the value of the bonds to decline would be remedied, resulting in an increase in value. In fact, the Cheatham IRA continued to purchase the bonds after Benchmark filed for reorganization under the bankruptcy code, paying 32 cents on the dollar. However, out of an initial

bond issue in the amount of $6.59 million, bondholders received a total of $339,452.05, or five cents on the dollar.

{¶ 7} The Cheatham IRA filed a class-action complaint, alleging that Huntington had breached the trust indenture. It alleged that the trust indenture required Huntington to exercise the rights and power vested in it by the trust indenture using the same degree of care and skill that a prudent person would exercise or use under the circumstances in the conduct of that person's own affairs. It further alleged that Huntington allowed the Villa North project to be mismanaged despite having available to it different remedies that could have protected the interests of the bondholders. Its claimed damages were the value of the bonds had Huntington acted immediately upon default to accelerate payment of interest and principal and disgorgement of Huntington's fiduciary fees to the bondholders based on their proportionate share of the bonds.

{¶ 8} The Cheatham IRA asked the court to certify a class of more than 50 bondholders who, on November 14, 2014 (the date of final distribution), owned bonds secured by the Villa North project. The Cheatham IRA argued in support of its motion for a class action that it had satisfied Civ.R. 23(B)(3), which requires that questions of law or fact common to the class predominate over questions that affect the individual members and that a class action is the superior means of adjudicating the dispute. Huntington opposed class certification, arguing that individual members of the proposed class of bondholders purchased their bonds at different times in the life of the Villa North project, so the evidence and legal issues on the breach-of-contract claim would differ based on when the class members acquired the bonds.

{¶ 9} The Cheatham IRA argued that it established commonality under R.C. 1308.16(A), which states that "a purchaser of a certificated or uncertificated security acquires all rights in the security that the transferor had or had power to transfer." It maintained that it made no difference whether there was commonality

4

as to when the bondholders acquired their bonds because the right to sue for breach of trust that was held by bondholders at the time of the breach transferred to subsequent purchasers of the bonds.

{¶ 10} The trial court held that commonality had not been established. It found that the Cheatham IRA had alleged numerous breaches of the trust indenture over a significant period of time and that the original bondholders' claims based on those breaches did not transfer to subsequent purchasers under the "rights in the security" language in R.C. 1308.16(A). Thus, the court held that the questions of law and fact common to the class members did not predominate over questions affecting each individual member, because each class member would allege a different time and purchase price as the basis for a breach and thus would have different potential damages.

{¶ 11} On appeal, the Sixth District Court of Appeals reversed. That court noted that the Cheatham IRA had phrased the issue as " 'whether the purchaser of a bond acquires causes of action that arose, under the terms of a Trust Indenture, prior to the time that the bondholder acquired the bonds.' " 2017-Ohio-9234, 102 N.E.3d 597, ¶ 13. Acknowledging that this was an issue of first impression in Ohio, the court of appeals looked to R.C. 140.01(J) and (I), which provide that a trust indenture is part of the "bond proceedings" and therefore is a right that is passed to a current bondholder under R.C. 1308.16(A). 2017-Ohio-9234, 102 N.E.3d 597, at ¶ 19. The court of appeals held that "a contract claim for breach of the Trust Indenture, whether asserted against the trustee or the obligor, arises out of the contract with the bondholders and is thus a 'right in the security' that automatically transfers to subsequent purchasers pursuant to R.C. 1308.16(A)." *Id*. at ¶ 27.

{¶ 12} A concurring judge stated her view that under R.C. 1308.16(A), a bondholder has standing to sue under a trust indenture but that the statute did not answer the ultimate question of whether a bondholder has standing to sue for prior breaches of that agreement. 2017-Ohio-9234, 102 N.E.3d 597, at ¶ 31 (Mayle, J.,

concurring). The concurring opinion stated that the answer could be found in whether an accrued cause of action could be asserted independently of continued ownership of the security. *Id*. at ¶ 38, citing *Natl. Res. Co. v. Metro. Trust Co.*, 17 Cal.2d 827, 833, 112 P.2d 598 (1941). The concurring opinion examined the trust indenture to determine what rights could be transferred to a subsequent bondholder under R.C. 1308.16(A). The indenture defined a "bondholder" as the person in whose name a bond was registered. In the concurring judge's view, actual ownership of a bond was a condition precedent to the maintenance of a cause of action, so the breach-of-contract claims under the trust indenture transferred with the bond to a subsequent bondholder because those claims could not be asserted apart from the contract out of which they arose and they were essential to the complete enforcement of the trust indenture. *Id*. at ¶ 42.

{¶ 13} We accepted jurisdiction over an appeal filed by Huntington, agreeing to hear the following proposition of law: "Absent a valid assignment of claims, the mere sale of a municipal bond does not automatically vest in the buyer, by operation of R.C. 1308.16 [UCC 8-302], all claims and causes of action of the seller relating to the bond that arose before the transaction." *See* 152 Ohio St.3d 1478, 2018-Ohio-1990, 98 N.E.3d 293.

**Analysis**

{¶ 14} The law distinguishes the rights inuring to the possession of property from personal rights or claims that remain with the seller or transferor of that property after sale to another. A personal right is known as a "chose in action," meaning a " 'proprietary right in personam, such as a debt owed by another person, a share in a joint-stock company, or a claim for damages in tort.' " *Pilkington N. Am., Inc. v. Travelers Cas. & Sur. Co.*, 112 Ohio St.3d 482, 2006-Ohio-6551, 861 N.E.2d 121, ¶ 19, quoting *Black's Law Dictionary* 258 (8th Ed.2004). The term can also be defined as " '[t]he right to bring an action to recover a debt, money, or thing.' " *Id*., quoting *Black's* at 258.

**{¶ 15}** Before the 17th century, "courts strictly adhered to the rule that a 'chose in action'—an interest in property not immediately reducible to possession (which, over time, came to include a financial interest such as a debt, a legal claim for money, or a contractual right)—simply 'could not be transferred to another person by the strict rules of the ancient common law.' " *Sprint Communications Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 275, 128 S.Ct. 2531, 171 L.Ed.2d 424 (2008), quoting 2 Blackstone, *Commentaries* *442. In other words, "[i]ntangible choses in action, such as a contract right and the right to bring a cause of action in a court of law, are also considered personal property." *Loveman v. Hamilton*, 66 Ohio St.2d 183, 185, 420 N.E.2d 1007 (1981). *See also DNAML Pty, Ltd. v. Apple Inc.*, S.D.N.Y. No. 13cv6516 (DLC), 2015 U.S. Dist. LEXIS 168245, at *11 (Dec. 16, 2015) ("the right to bring a 'chose in action' was a personal right separate from the property that gave rise to the right"). The common-law principle was based on the belief that allowing the transfer of choses in action would create additional lawsuits and officious intermeddling with existing lawsuits. *Sprint Communications* at 275-276.

**{¶ 16}** By the 17th century, as English commerce expanded, the law also evolved and came to recognize that choses in action could be assigned. *Id.* at 276. Indeed, Ohio has long permitted the assignment of a chose in action to a third party. *See Townsend v. Carpenter*, 11 Ohio 21, 23 (1841); *Erie Brewing Co. v. Ohio Farmers Ins. Co.*, 81 Ohio St. 1, 23, 89 N.E. 1065 (1909).

**{¶ 17}** There is no question that the Cheatham IRA purchased its bonds after Huntington allegedly breached the trust indenture. There is likewise no question that the Cheatham IRA has not been assigned any rights to causes of action by a party who held the bonds at a time when the Cheatham IRA alleges that Huntington's alleged breach occurred. The Cheatham IRA has stated that its "class certification effort is based upon the fundamental proposition that the purchase of one of the bonds at issue in this case gives the purchaser all of the rights in that

bond that the seller had prior to the sale. That includes any claim that the seller had against Huntington Bank." The trial court noted that the Cheatham IRA conceded that if its "interpretation of R.C. 1308.16 is incorrect, class certification is not justified in this case."

{¶ 18} The court of appeals erred to the extent that it held that a breach-of-contract claim that accrued before the sale of a bond automatically transferred with the bond under R.C. 1308.16(A). While language in R.C. 1308.16(A) stating that "a purchaser of a certificated or uncertificated security acquires all rights in the security that the transferor had or had power to transfer" might superficially support the conclusion that it provides for the automatic assignment of any rights held by the prior bondholder, the drafting history of this section shows that it does not apply to transfers of choses in action.

{¶ 19} The clearest statement of intent behind R.C. 1308.16(A) is contained in the Official Comment to that section: "Subsection (a) provides that a purchaser of a certificated or uncertificated security acquires all rights that the transferor had or had power to transfer. This statement of the familiar 'shelter' principle is qualified by the exceptions that a purchaser of a limited interest acquires only that interest, subsection (b), and that a person who does not qualify as a protected purchaser cannot improve its position by taking from a subsequent protected purchaser, subsection (c)."

{¶ 20} In other words, "after property has passed into the hands of a bona fide purchaser, subsequent purchasers, even those with notice of asserted defenses, take clear of the defense. The reason is to protect the bona fide purchaser so that he can sell what he has purchased." *Abraham Lincoln Ins. Co. v. Franklin S. & L. Assn.*, 434 F.2d 264, 266 (8th Cir.1970). "As an expression of the shelter rule, § 8-302(a) does not define 'rights in the security' as any right associated with the security that the transferor 'had or had power to transfer.' Instead, the phrase 'had or had power to transfer' stands for the unremarkable proposition that people

8

cannot transfer rights that they do not own or control." *Consol. Edison, Inc. v. Northeast Util.*, 318 F.Supp.2d 181, 188 (S.D.N.Y.2004), *rev'd on other grounds*, 426 F.3d 524 (2d Cir.2005). *See also First United Fin. Corp. v. Specialty Oil Co., Inc.-I*, 5 F.3d 944, 947 (5th Cir.1993) (noting that UCC 8-302(1) sets forth the shelter rule); *Fraternity Fund Ltd. v. Beacon Hill Asset Mgt., L.L.C.*, 479 F.Supp.2d 349, 373, fn. l26 (S.D.N.Y.2007) ("Section 8-302(a) thus primarily concerns issues of title, such as defenses against enforcement of ownership rights. It does not provide for the automatic transfer of fraud claims against third parties" [citation omitted]).

{¶ 21} We interpret the UCC with an eye toward maintaining uniformity with other states. *See Casserlie v. Shell Oil Co.*, 121 Ohio St.3d 55, 2009-Ohio-3, 902 N.E.2d 1, ¶ 18; *Edward A. Kemmler Mem. Found. v. 691/733 E. Dublin–Granville Rd. Co.*, 62 Ohio St.3d 494, 499, 584 N.E.2d 695 (1992). In fact, R.C. 1301.103(A)(3) requires that the UCC provisions in the Revised Code be construed liberally "[t]o make uniform the law among the various jurisdictions." And "[a]s we stated in *State ex rel. Hunt v. Fronizer* (1907), 77 Ohio St. 7, 16, 82 N.E. 518, 'the general assembly will not be presumed to have intended to abrogate a settled rule of the common law unless the language used in a statute clearly supports such intention.' " *Mandelbaum v. Mandelbaum*, 121 Ohio St.3d 433, 2009-Ohio-1222, 905 N.E.2d 172, ¶ 29. No other jurisdiction has interpreted R.C. 1308.16(A) (UCC 8-302(1)) as doing anything more than stating the shelter principle and the General Assembly has not indicated that when it enacted R.C. 1308.16(A) it intended to abandon the common-law rule that choses of action do not automatically transfer.

{¶ 22} Our holding is consistent with federal law under the Trust Indenture Act, 15 U.S.C. 77aaa through bbbb ("TIA"). In particular, 15 U.S.C. 77www states that any person who makes misleading statements or omissions in any document filed with the Securities and Exchange Commission shall be liable to persons who purchased such securities in reliance upon the statements or omissions. "The statute

provides nothing for subsequent purchasers to whom no misrepresentations were made directly or indirectly and to whom no statutorily provided cause of action was expressly assigned." *In re Nucorp Energy Securities Litigation*, 772 F.2d 1486, 1490 (9th Cir.1985). This is because "[a] cause of action arising from reliance on misrepresentation is personal to those persons who relied; it does not follow the security to remote purchasers who had no basis for reliance." *Id.*, citing *Indep. Investor Protective League v. Saunders*, 64 F.R.D. 564, 572 (E.D.Pa.1974). And even more definitively, "[a]pplying federal law, the courts have held that federal securities law claims are not automatically assigned to a subsequent purchaser upon the sale of the underlying security." *Bluebird Partners, L.P. v. First Fid. Bank, N.A.*, 85 F.3d 970, 974 (2d Cir.1996). *See also In re Natl. Century Fin. Ents., Inc.*, 755 F.Supp.2d 857, 867 (S.D.Ohio 2010). To be sure, the Cheatham IRA did not bring its claim under the TIA, but the federal law informs our analysis of whether Ohio law should provide for automatic transfer of common-law claims to a subsequent purchaser.

{¶ 23} We hold that R.C. 1308.16(A) does not operate to allow the automatic assignment of rights upon a transfer of title; it sets forth only the shelter rule of securities—the transferee takes all rights in the thing transferred that the transferor had the power to give.

{¶ 24} Although the Cheatham IRA claims in its motion for class certification that the class includes all those who hold bonds, it has largely abandoned that position on appeal. It makes no argument that the official comment or history of R.C. 1308.16(A) (UCC 8-302(1)) supports the automatic assignment of choses in action upon the sale of a security. The Cheatham IRA maintains that because the trust indenture states that actual ownership of the bond is a condition precedent to maintaining a cause of action for breach of the trust indenture, only bondholders can enforce the terms of the indenture. In other words, it maintains that a breach-of-contract claim arising from conduct occurring before the

10

bondholder acquired the bond is a "right in the security" under R.C. 1308.16(A) that adheres to and travels with the bond.

{¶ 25} "[A] trust indenture is defined as 'a document containing the terms and conditions governing a trustee's conduct and the trust beneficiaries' rights.' " *Deutsche Bank Natl. Trust Co. v. Rudolph*, 8th Dist. Cuyahoga No. 98383, 2012-Ohio-6141, ¶ 8, quoting *Black's Law Dictionary* 838 (9th Ed.2009). It is, then, a contract between the bondholders and the indenture trustee. *Drage v. Santa Fe Pacific Corp.*, 8th Dist. Cuyahoga No. 67966, 1995 Ohio App. LEXIS 2833, at *9 (July 3, 1995), fn. 1; *In re Sunshine Jr. Stores, Inc.*, 456 F.3d 1291, 1309 (11th Cir.2006) (an indenture trustee is "created and governed by contract"). "Unlike the ordinary trustee, who has historic common-law duties imposed beyond those in the trust agreement, an indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement." *Meckel v. Continental Resources Co.*, 758 F.2d 811, 816 (2d Cir.1985). Because the trust indenture is a contract, we construe it consistently with basic principles of contract construction. *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039 (2d Cir.1982); *Jamie Securities Co. v. The Limited, Inc.*, 880 F.2d 1572, 1576 (2d Cir.1989).

{¶ 26} The trust indenture states that it is intended "for the equal and proportionate benefit, security and protection of all present and future holders and owners of the Bonds issued or to be issued under and secured by [the] Indenture." In addition, the indenture states that a holder of a bond shall have no right to enforce the indenture "except as provided in the Indenture."

{¶ 27} From these terms, the Cheatham IRA argues that the class includes current bondholders and that those bondholders can assert a claim for breach of the trust indenture even if the breach occurred before they purchased the bond.

{¶ 28} Language stating that the trust indenture is for the "benefit, security and protection of all present and future holders and owners of the Bonds" says

nothing about whether a subsequent holder of a bond can sue for a breach of the trust indenture that occurred before the holder came into possession of the bond. We interpret words used in contracts according to their plain and ordinary meaning unless another meaning is evident from the face or overall content of the contract, or unless the result is manifestly absurd. *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146 (1978), paragraph two of the syllabus. Language stating that the trust indenture is for the benefit of all present and future bondholders does not by itself provide for automatic transfer of any chose in action stemming from a violation of the indenture: it states merely the proposition that Huntington is bound by the terms of the trust indenture, whether the bonds were purchased upon initial offering or purchased in the secondary market. This language does not expressly provide for automatic transfer of a chose in action.

{¶ 29} That only bondholders can enforce the terms of the indenture means that persons who do not hold a bond have no right to enforce its terms. This language does nothing more than define who has standing to sue based on the contractual relationship between the indenture trustee and the bondholders the trust is directly intended to benefit. This language limits the indenture trustee's liability to third persons—not bondholders—consistent with the rule that " '[p]erformance of a contract will often benefit a third person. But unless the third person is an intended beneficiary * * *, no duty to him is created.' " *Hill v. Sonitrol of Southwestern Ohio*, 36 Ohio St.3d 36, 40, 521 N.E.2d 780 (1988), quoting 2 Restatement of the Law 2d, Contracts, Section 302, Comment e (1981).

{¶ 30} Parties to a contract may include terms in derogation of common law, *see, e.g.*, *Alyeska Pipeline Serv. Co. v. Wilderness Soc.*, 421 U.S. 240, 256, 44 L. Ed. 2d 141, 95 S. Ct. 1612 (1975) ("absent statute or enforceable contract, litigants pay their own attorneys' fees"), but the intent to do so must be clearly indicated, *17 Mile, L.L.C. v. Kruzel*, 8th Dist. Cuyahoga No. 99358, 2013-Ohio-

12

3005, ¶ 17. And in this case, Section 11.03 of the trust indenture states that any rights that are not specifically mentioned in the trust indenture are not implied:

> With the exception of rights herein expressly conferred, nothing expressed or mentioned in or to be implied from this Indenture or the Bonds is intended or shall be construed to give to any person other than the parties hereto, the Lessee, and the Bondholders any legal or equitable right, remedy or claim under or in respect to this Indenture or any covenants, conditions and provision herein contained; this Indenture and all of the covenants, condition and provisions hereof being intended to be and being for the sole and exclusive benefit of the parties hereto, the Lessee and the Bondholders as herein provided.

{¶ 31} Not only does the trust indenture contain no language stating that accrued causes of action based on the trust indenture automatically transfer to subsequent bondholders in contradiction to the common-law rule, it also forbids an implication that accrued rights are automatically transferred. It follows that language stating that only bondholders can bring suit for a violation of the trust indenture does not by itself transfer a chose in action that is a personal property right to a subsequent holder of a bond.

{¶ 32} The Cheatham IRA maintains that a claim for breach of a trust indenture is a nonpersonal claim and a "right in the security" that travels with the bond. In support of this argument, it cites *In re Activision Blizzard, Inc. Stockholder Litigation*, 124 A.3d 1025, 1030 (Del.Ch.2015), in which the court considered whether to approve a settlement in a shareholder derivative suit challenging a transaction in which one corporation sold its controlling equity position in a second corporation to the two most senior officers of the second corporation. Several shareholders of the second corporation brought a derivative action on behalf of the

second corporation alleging breach of fiduciary duty by, among others, the directors of the second corporation who had approved the sale without a shareholder vote. The parties reached a settlement, but a shareholder objected on grounds that he and all others who held shares in the second corporation during the relevant period had personal claims for damages that were not lost when they subsequently sold their shares. *Id*. at 1043. The Chancery Court approved the settlement, noting that under Delaware law, "the right to assert the claim and benefit from any recovery is a property right associated with the shares. By default, that property right travels with the shares. By selling their shares, the members of the Seller Class defeased to their purchasers any right they had to bring or benefit from these claims." *Id*. at 1044. The court went on to note that any shareholder who sells shares voluntarily " 'made a conscious business decision to sell their shares into a market that implicitly reflect[s] the value of the pending and any prospective lawsuits.' " *Id*., quoting *In re Resorts Internatl. Shareholders Litigation*, Del.Ch. CIV. A. Nos. 9470 and 8605, 1988 WL 92749, at *10 (Sept. 7, 1988).

{¶ 33} *Activision* addressed corporate stock and the "the causes of action conferred on stockholders by specific statutory provisions of the [Delaware General Corporation Law]." *Id*. at 1049. Among those statutory causes of action conferred on shareholders are "the right to vote, the right to compel payment of a contractually specified dividend, and the right to own and alienate shares." Id. at 1049-1050. *Activision* acknowledges that these Delaware statutory rights are different from "personal claims," a "[q]uintessential" example of which would include a claim for breach of an agreement to purchase or sell shares of stock, for which the "the nature of the underlying property does not matter." *Id*. at 1056. This is because this type of breach-of-contract claim arises not from the security itself but from the contract between the buyer and seller. *Id*. This claim is a chose in action that is a personal-property right that can be transferred only by express assignment.

**{¶ 34}** The Cheatham IRA also relies on *Leverso v. SouthTrust Bank of Alabama, N.A.*, 18 F.3d 1527 (11th Cir.1994), in which the United States Court of Appeals for the Eleventh Circuit vacated an approved settlement of a class-action suit brought on behalf of all bondholders against the indenture trustee of the bond proceeds. The settlement agreement proposed to distribute settlement funds among the bondholders according to the amount each bondholder had paid for the bonds. Bondholders who purchased bonds in the secondary market at discount prices objected. The Eleventh Circuit construed the matter as one of contract governed by the trust indenture and concluded that "[t]he plain language of several sections of the trust indenture, including the default section, unambiguously provides for each bond to be treated as every other bond" and that the trust indenture made no distinctions "according to when the bond was purchased." *Id*. at 1534. Nevertheless, *Leverso* made it clear that it did not decide that a cause of action automatically passed to subsequent purchasers of a bond: "In this case, no objections to whether certain claims were available to the secondary market purchasers were raised before the district court, nor do we address such an issue." *Id*. at 1533, fn. 9. *Leverso* is distinguishable.

**{¶ 35}** The Cheatham IRA purchased the bonds at a discount that reflected the ongoing issues with the Villa North project. In a real sense, it has suffered no injury from Huntington's alleged breach of the trust indenture that occurred before it purchased the bonds because that alleged mismanagement contributed in part to the reduced price the Cheatham IRA paid for the bonds. *See Bluebird Partners, L.P. v. First Fid. Bank,* 896 F.Supp. 152, 157 (S.D.N.Y.1995) ("Market forces assured that the price plaintiff paid for certificates which would never be wholly redeemed reflected their diminished value. The injury was sustained by the sellers who parted with these certificates at a reduced price, not by plaintiff who purchased them at their post-bankruptcy value"); *see also In re Nucorp*, 772 F.2d at 1490 (automatic assignment "would remove the remedy from those to whom the statute

provides it * * * by gratuitously giving it to those who were not defrauded and have suffered no injury under the securities law").

{¶ 36} It follows that absent specific assignment of a chose in action for breach of contract, the trust indenture here does not automatically assign that right. The Cheatham IRA has, by virtue of being a bondholder, standing to enforce the terms of the trust indenture, but that does not mean that it was assigned a chose in action that accrued before it owned the bonds. The Cheatham IRA has been clear that its claim is based on Huntington's alleged failure to act upon notice of the initial default. Only those who owned the bonds at the time of the original default could bring an action for that breach of the trust indenture.

{¶ 37} This case came to us on appeal from a judgment finding that the court of common pleas erred by refusing to certify a class action on grounds that the class lacked commonality. A class action is a representative action in which a plaintiff sues a defendant on behalf of a group or class of absent persons who have suffered harm similar in kind to the named plaintiff. As applicable here, the Cheatham IRA relies on Civ.R. 23(B)(3) as a basis for certifying a class: "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

{¶ 38} Civ.R. 23 is modeled after Fed.R.Civ.P. 23, so federal law is persuasive authority when interpreting the Ohio rule. *Stammco, L.L.C. v. United Tel. Co. of Ohio*, 136 Ohio St.3d 231, 2013-Ohio-3019, 994 N.E.2d 408, ¶ 18. On the question of commonality under Civ.R. 23(B)(3)—that there are issues of law or fact common to the class—we consider whether a class action has the capacity " 'to generate common *answers* apt to drive the resolution of the litigation.' " (Emphasis added in *Wal-Mart Stores*.) *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011), quoting Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U.L.Rev. 97, 132 (2009). With

respect to commonality and damages, "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *E. Texas Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977), quoting *Schlesinger v. Reservists Commt. to Stop the War*, 418 U.S. 208, 216, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974).

**{¶ 39}** The Cheatham IRA concedes that if a breach-of-contract claim did not automatically transfer, a class action is no longer viable. We therefore reverse the judgment of the Sixth District Court of Appeals, and we remand to the court of common pleas for further proceedings. We express no opinion on whether any breach-of-contract claims that the Cheatham IRA asserts accrued after its purchase of Villa North bonds remain viable.

Judgment reversed

and cause remanded.

O'CONNOR, C.J., and FRENCH and DONNELLY, JJ., concur.

FISCHER, J., concurs in the judgment and in paragraphs 1 through 23 of the majority opinion.

KENNEDY, J., concurs in judgment only, with an opinion joined by DEWINE, J.

_____

**KENNEDY, J., concurring in judgment only**.

**{¶ 40}** I agree with the majority's conclusion that absent a valid assignment of claims, the sale of a municipal bond does not automatically vest in the buyer all claims and causes of action of the seller relating to the bond that arose before the transaction. I write separately, however, because I think the court need look no further than the plain and unambiguous language of R.C. 1308.16(A) to reach this conclusion. Therefore, I concur in judgment only.

**{¶ 41}** A court's interpretation of a statute is a question of law that we review de novo. *State v. Pariag*, 137 Ohio St.3d 81, 2013-Ohio-4010, 998 N.E.2d

401, ¶ 9. "When the statutory language is plain and unambiguous, and conveys a clear and definite meaning, we must rely on what the General Assembly has said." *Jones v. Action Coupling & Equip., Inc*., 98 Ohio St.3d 330, 2003-Ohio-1099, 784 N.E.2d 1172, ¶ 12, citing *Symmes Twp. Bd. of Trustees v. Smyth*, 87 Ohio St.3d 549, 553, 721 N.E.2d 1057 (2000).

**{¶ 42}** "Where a statute defines terms used therein, such definition controls in the application of the statute * * *." *Good Samaritan Hosp. of Dayton v. Porterfield*, 29 Ohio St.2d 25, 30, 278 N.E.2d 26 (1972), citing *Terteling Bros., Inc. v. Glander*, 151 Ohio St. 236, 241, 85 N.E.2d 379 (1949), and *Woman's Internatl. Bowling Congress, Inc. v. Porterfield*, 25 Ohio St.2d 271, 275, 267 N.E.2d 781 (1971). Terms that are undefined in a statute are accorded their common, everyday meaning. R.C. 1.42.

**{¶ 43}** R.C. 1308.16(A) provides that "a purchaser of a certificated or uncertificated security acquires all rights in the security that the transferor had or had power to transfer."

**{¶ 44}** The crux of this dispute rests on the meaning of the phrase "rights in the security," which the General Assembly did not define in R.C. Chapter 1308. However, "security" is defined in R.C. 1308.01(A)(15) as

> an obligation of an issuer or a share, participation, or other interest in an issuer or in property or an enterprise of an issuer:
>
> (a) Which is represented by a security certificate in bearer or registered form, or the transfer of which may be registered upon books maintained for that purpose by or on behalf of the issuer;
>
> (b) Which is one of a class or series or by its terms is divisible into a class or series of shares, participations, interests, or obligations; and
>
> (c) Which:

18

(i) Is, or is of a type, dealt in or traded on securities exchanges or securities markets; or

(ii) Is a medium for investment and by its terms expressly provides that it is a security governed by this chapter.

**{¶ 45}** The General Assembly did not define "rights" or "in;" therefore, I will consider the dictionary definitions of these terms. "Rights" has multiple definitions, but in the context of securities, the relevant definition is: "a claim or title to property or a possession." *Id.*

**{¶ 46}** "In" likewise has numerous definitions. However, in R.C. 1308.16(A) it is "used as a function word to indicate the specific object, sphere, or aspect to which a qualification is restricted." *Webster's Third New International Dictionary* 1139 (2002). Therefore, "in" limits "rights" to "security."

**{¶ 47}** Applying these definitions, R.C. 1308.16(A) is susceptible of only one interpretation: the purchaser of the bond acquires the legally recognized title to the bond that the seller had the power to transfer. In other words, if the seller was a bona fide holder of the bond, then the purchaser acquires the bond as a holder in due course.

**{¶ 48}** The Sixth District Court of Appeals concluded that appellee Paul Cheatham I.R.A.'s "claim for breach of the Trust Indenture arises out of the contract with the bondholders, and is therefore properly considered a 'right in the security' that passes to a subsequent purchaser under R.C. 1308.16(A)." 2017-Ohio-9234, 102 N.E.3d 597, ¶ 19. The plain and unambiguous language of R.C. 1308.16(A), however, does not encompass the trust indenture. A "trust indenture" is "[a] document containing the terms and conditions governing a trustee's conduct and the trust beneficiaries' rights." *Black's Law Dictionary* 887 (10th Ed.2014). Thus, a trust indenture is not a security. And, as stated above, the word "in" in R.C. 1308.16(A) restricts the purchaser's "rights"—their claim, interest, and/or title—to

the "security."  Therefore, a claim by a bondholder against a trustee for a breach of the trust indenture that accrued before the bondholder purchased the bond is not encompassed within the plain and unambiguous meaning of "rights in the security."

{¶ 49} To find otherwise would require this court to read the phrase "related to" into R.C. 1308.16(A).  However, "[u]nambiguous statutes are to be applied according to the plain meaning of the words used, and courts are not free to * * * insert other words."  (Citation omitted.)  *State ex rel. Burrows v. Indus. Comm.*, 78 Ohio St.3d 78, 81, 676 N.E.2d 519 (1997).

{¶ 50} Because the plain and unambiguous language of R.C. 1308.16(A) does not permit Cheatham's breach-of-contract claim, I concur in judgment only.

DEWINE, J., concurs in the foregoing opinion.

_____

Strauss Troy and Ronald R. Parry, for appellee.

Porter, Wright, Morris & Arthur, L.L.P., Kathleen M. Trafford, J. Philip Calabrese, and Jay A. Yurkiw, for appellant.

Thompson Hine, L.L.P., Scott A. King, Brian J. Lamb, and Terry W. Posey Jr., urging reversal for amicus curiae American Bankers Association.

Dennis D. Hisch, urging reversal for amici curiae commercial-law professors.

_____